**Robert L. RUCKER, Appellant,**

v.

**Jesse BROWN, Secretary of Veterans Affairs, Appellee.**

No. 94–0927.

United States Court of Veterans Appeals.

Jan. 27, 1997.

B. Joyce Smith, Muskogee, OK, was on the brief for appellant.

Mary Lou Keener, General Counsel; Ron Garvin, Assistant General Counsel; R. Randall Campbell, Deputy Assistant General Counsel; and Michael A. Leonard, Washington, DC, were on the brief for appellee.

Before NEBEKER, Chief Judge, and FARLEY and STEINBERG, Judges.

NEBEKER, Chief Judge, filed the opinion of the Court. STEINBERG, Judge, filed an opinion, concurring in part and dissenting in part.

NEBEKER, Chief Judge:

The appellant, Robert L. Rucker, appeals a July 25, 1994, Board of Veterans' Appeals (Board or BVA) decision that found his claims for service connection for cancers of the bladder, left kidney, prostate, and right lung not well grounded. After considering the record on appeal and the briefs of the parties, the Court will affirm the BVA decision in part, reverse the decision in part, and remand a matter to the Board for further adjudication.

## I. FACTS

The appellant served on active duty in the U.S. Navy from March 1944 to January 1946. Record (R.) at 20. While in service, he received special training in naval radar operation, and achieved the rating of Radarman, second class. R. at 974. He first claimed entitlement to service connection for bladder cancer and a heart condition in November 1975. R. at 20–23. Those claims were denied in December 1975. R. at 25. He next claimed entitlement to service connection for conditions of the hands, sinuses, nerves, knees, and hip in March 1991. R. at 186–87. Those claims were denied in August 1991. R. at 213–14. The appellant then filed another claim for service connection for "hearing loss, stress and nervous condition; both knees; radiation exposure [and] radar x-ray exposure[,] and the residuals thereof." R. at 216. The claim for hearing loss and his attempts to reopen claims for a nervous condition and knee condition were denied by a rating decision in December 1991. R. at 1017–18. By letter dated February 21, 1992, the regional office (RO) denied the appellant's claims for service connection for carcinomas of the bladder, kidney, prostate, and right lung, secondary to radiation exposure. R. at 1030. The letter stated that "radar emi[ssions], microwave type radiation does not qualify for service connection under cur-rent provisions of the law, as it emits no ionizing radiation." *Ibid.* In June 1992, the appellant filed a timely Notice of Disagreement (NOD) for the denial of his carcinoma claims. R. at 1039.

Pursuant to 38 C.F.R. § 3.311(a), VA requested the Defense Nuclear Agency (DNA) to provide a dose estimate of the appellant's exposure to ionizing radiation during service from the bombs dropped on Hiroshima and Nagasaki, Japan. R. at 1042. The DNA reported that the appellant had never been closer than 1500 miles to the main Japanese islands, and concluded that "[a]t such a distance there was no risk of exposure to radiation from the strategic atomic bombing of either city." R. at 1052. In November 1992, the appellant's claims for his four carcinomas, secondary to radiation exposure, were again denied. R. at 1076. A Statement of the Case (SOC) was sent later that month. R. at 1074. In January 1993, the appellant filed an appeal, referencing only his exposure to ionizing radiation (R. at 1087), and in March 1993, a statement in support of his claim, which added "microwave radiation radar exposure" as the possible cause of his cancers. R. at 1181. In support of his claim, the appellant submitted several articles on the possible effects of radiation exposure. R. at 1098–168. By a confirmed rating decision in February 1993, the appellant's claims continued to be denied. R. at 1172.

In June 1993, following a hearing before a traveling section of the Board, the appellant submitted several articles on radar and microwave radiation: *The Microwave Problem,* Scientific American, September 1986; *Effects upon Health of Occupational Exposure to Microwave Radiation (RADAR)*, American Journal of Epidemiology, Vol. 112, 1980; and *Biological Effects of Radiofrequency Radiation,* United States Environmental Protection Agency, September 1984. R. 1213–26, 1242–66. The articles establish, inter alia, that naval radar equipment emits microwave-type non-ionizing radiation. *Ibid.* The appellant also submitted two statements from Dr. Timothy R. Young, one of the appellant's treating physicians (R. at 1212, 1268), and additional statements from a former shipmate and the daughter of a former

shipmate (R. at 1227–28, 1267). In his June 1993 statement, Dr. Young opined:

> He [the veteran] has also asked me to comment on his likelihood of having four separate carcinomas. Mr. Rucker apparently did have a significant radiation exposure when he was in the Service many years ago; I believe in conjunction with radar operation. I think it is highly unlikely that Mr. Rucker would have four separate carcinomas within a short period of time had he not had some factor other than normal environmental exposures to cause this. I think it is quite reasonable to assume that the exposure he had in the Service is the cause of these multiple carcinomas. I have not had another patient with four separate carcinomas in my 15 years of practice and the extremely small statistical chance of this occurring, combined with Mr. Rucker's previous exposure, I think makes it highly likely this is the cause.

R. at 1268. At the June 1993 hearing, the appellant's son, James Rucker, related that the veteran had told him about one morning, while on active duty aboard a ship during the summer of 1945, when he woke up with blisters on his hands and the bottom of his feet. R. at 1192. The veteran reported to sick bay where he was treated by a Dr. Dwyer. *Ibid.* This entire incident was confirmed by the appellant. The son further testified that they had tried to locate the treating physician, but had been unsuccessful. *Ibid.*

The BVA decision on appeal followed. The issue before the Board was whether the veteran was entitled to service connection for the four cancers "due to exposure to radiation in service." R. at 1. In its opinion, the Board set forth the applicable criteria for establishing a well-grounded claim, then discussed the DNA's estimate regarding the appellant's exposure to ionizing radiation. R. at 4. The Board further noted that, because the veteran was not interned as a prisoner of war in Japan, did not participate in the occupation of Hiroshima or Nagasaki, and did not participate in service in a test involving the atmospheric detonation of a nuclear device by the United States, he did not fall under the presumptive provisions of 38 C.F.R. §§ 3.309(d) (pertaining to certain diseases specific to radiation-exposed veterans), and 3.311(b) (pertaining to claims based on exposure to ionizing radiation for certain radiogenic diseases). R. at 5. The Board stated that "the appellant is still free to establish by competent medical evidence that the claimed disabilities resulted from his exposure to radiation in service. . . . In support of his claim, however, the appellant has offered primarily his own opinion that the disabilities at issue in this appeal were caused by radiation exposure in service." *Ibid.* The Board disregarded the medical articles and texts, stating that they merely "describe[d] the effects of radiation exposure in general." *Ibid.* In dismissing the opinion of Dr. T.R. Young, the Board concluded that;

> Dr. Young does not present any special qualifications or expertise in the field of radiation exposure; moreover, his opinion appears to be based upon nothing more than conversations with the appellant—not upon a review of the relevant medical and military records. Furthermore, it is well settled that medical opinions couched in such imprecise, "may or may not" terms are insufficient to establish a well-grounded claim.

R. at 6. The Board held that the appellant's claims for service connection were not well grounded as no "competent medical evidence establishing a causal link between the appellant's exposure to radiation in service and the four disabilities at issue" had been presented. R. at 6.

## II. ANALYSIS

This Court reviews de novo the question of whether a claim is well grounded. *Grottveit v. Brown*, 5 Vet.App. 91, 92 (1993). "[A] person who submits a claim for benefits under a law administered by the Secretary shall have the burden of submitting evidence sufficient to justify a belief by a fair and impartial individual that the claim is well grounded." 38 U.S.C. § 5107(a). The Court has interpreted this burden as the necessity of submitting a claim that is "a plausible claim, one which is meritorious on its own or capable of substantiation. Such a claim need not be conclusive, but only possible to satisfy

the initial burden of § [5107(a) ]." *Murphy v. Derwinski,* 1 Vet.App. 78, 81 (1990). Where the determinative issue involves either medical etiology or a medical diagnosis, competent medical evidence is required to fulfill the well-grounded-claim requirement; where the determinative issue is factual in nature, lay testimony may suffice by itself. *See Grottveit,* 5 Vet.App. at 93; *Espiritu v. Derwinski,* 2 Vet.App. 492, 494–95 (1992).

### A. Ionizing Radiation

Service connection for cancer which is claimed to be attributable to ionizing radiation exposure during service can be accomplished in three different ways. *Ramey v. Brown,* 9 Vet.App. 40, 44 (1996). First, there are 15 types of cancer which will be presumptively service connected. 38 U.S.C. § 1112(c). Second, 38 C.F.R. § 3.311(b) (1995) provides a list of "radiogenic diseases" which will be service connected provided that certain conditions specified in that regulation are met. Third, direct service connection can be established by "show[ing] that the disease or malady was incurred during or aggravated by service," a task which "includes the difficult burden of tracing causation to a condition or event during service." *Combee v. Brown,* 34 F.3d 1039, 1043 (Fed. Cir.1994).

█ Qualification under the presumptive provision of 38 U.S.C. § 1112(c) occurs when the veteran suffers from one the fifteen listed cancers, and establishes his participation in a "radiation risk activity", defined as:

(i) Onsite participation in a test involving the atmospheric detonation of a nuclear device.

(ii) The occupation of Hiroshima or Nagasaki, Japan, by United States forces during the period beginning on August 6, 1945, and ending on July 1, 1946.

(iii) Internment as prisoner of war in Japan (or service on active duty in Japan immediately following such internment) during World War II which (as determined by the Secretary) resulted in an opportunity for exposure to ionizing radiation comparable to that of veterans described in clause (ii) of this subparagraph.

38 U.S.C. § 1112(c)(4)(B). Cancers of the bladder, kidney, prostate, and lung are not included in the list of fifteen. 38 U.S.C. § 1112(c)(2)(A-M). Similarly, the appellant has admitted to not participating in a "radiation risk activity" as defined by the statute. Therefore, section 1112 is not available to the appellant.

Under 38 C.F.R. § 3.311(b), cancers of the lung, kidney, and bladder are considered "radiogenic diseases." 38 C.F.R. § 3.311(b)(2)(iv),(xii),(xiii). Under this regulation, when it is determined that:

(i) A veteran was exposed to ionizing radiation as a result of participation in ... the occupation of Hiroshima or Nagasaki, Japan, from September 1945 until July 1946 ...;

(ii) The veteran subsequently developed a radiogenic disease; and

(iii) Such disease first became manifest within the period specified in paragraph (b)(5) of this section [for lung, kidney and bladder cancers, "5 years or more after exposure"];

the claim will then "be referred ... for further consideration in accordance with paragraph (c) of this section." 38 C.F.R. § 3.311(b)(1).

█ Upon receiving the appellant's claim, the RO requested a dose estimate from the DNA, which responded that the appellant had never been closer than 1500 miles to the main Japanese islands, and concluded that "[a]t such a distance there was no risk of exposure to radiation from the strategic bombing of either city." R. at 1052. The Court holds that with respect to ionizing radiation, the DNA statement and the appellant's service records provide a plausible basis for the Board's finding that the appellant's cancers should not be service connected under 38 C.F.R. § 3.311(b).

█ In *Combee,* the United States Court of Appeals for the Federal Circuit determined that service connection for cancer can be pursued under the general VA compensation entitlement system. *Combee,* 34 F.3d at 1043; *see* 38 U.S.C. § 1110 (basic entitlement to disability compensation for wartime veterans). In *Ramey,* this Court addressed the

applicability of *Combee* to a similar claim for service connection for cancer in conjunction with ionizing radiation. *Ramey,* 9 Vet.App. at 45. As was the case in *Ramey,* the BVA decision here was issued prior to the *Combee* opinion, and the BVA failed to address the question of direct service connection. However, a remand on this basis is unnecessary because the appellant has failed to submit a well-grounded claim based on ionizing radiation. *See Ramey, supra* at 45–46. He has not submitted any competent medical evidence linking his cancers to his service, or established through his service records that he was exposed to any significant amount of ionizing radiation while in the Navy. Moreover, the DNA-provided dose estimate conclusively stated that the appellant was at "no risk of exposure to [ionizing] radiation" based on his time in service. R. at 1052. Accordingly, the appellant's claim for service connection for his four cancers with respect to ionizing radiation is not well grounded, and the Board's failure to address the point before the *Combee* decision is no basis for a remand.

### B. Non–Ionizing Radiation

■ Before today, the Court has not addressed the threshold question of what evidence will suffice to well-ground a claim for service connection based on non-ionizing radiation exposure. Nevertheless, the lens under which such proffered evidence must be viewed is discernable from the Court's existing jurisprudence. In *Justus v. Principi,* 3 Vet.App. 510 (1992), this Court held that in an attempt to reopen a previously disallowed claim, the credibility of evidence is to be presumed, and that further,

> [o]nce the evidence is found to be new and material and the case is reopened, the presumption that it is credible and entitled to full weight no longer applies. In the adjudication that follows the reopening, the Board having accepted provisionally for reopening purposes the credibility of the new evidence, then must determine, as a question of fact, both the weight and credibility of the new evidence in the context of all the evidence, new and old.

*Id.* at 513. In *King v. Brown,* 5 Vet.App. 19, 21 (1993), this presumption of credibility was expressly extended to evidence submitted to render claims well grounded. There, the Court further articulated that "[e]xceptions to this rule occur when the evidentiary assertion is inherently incredible or when the fact asserted is beyond the competence of the person making the assertion." *Ibid.* In determining whether a claim is well grounded where the proposed medical theory has scientific underpinnings, we similarly hold that the Board must presume the credibility of the scientific theory unless it is "inherently incredible." *Cf. Robinette,* 8 Vet.App. at 75–76. In the instant case, the BVA committed error in assessing the credibility and weight of the evidence before determining whether the claim was well grounded.

The appellant has offered evidence that his four cancers were caused by non-ionizing radiation emanating from the naval radar equipment he manned while on active duty. Several articles were submitted that document the uncertainty and controversy surrounding microwave (non-ionizing) radiation. One of them states, "The health implications or hazards of exposure of man to this type of non-ionizing radiation remain a matter of concern and uncertainty. The nature of biologic effects and the levels of microwave radiation which can induce them in man are unclear particularly with respect to long-term effects." R. at 1219–20. Of note, one study recorded a statistically significant occurrence of primary malignant tumors in radiation-exposed rats when compared to the unexposed control group. The authors recognized that "[a]t face value this last finding suggested that low levels of microwave radiation can cause cancer in mice (and by inference in humans)." R. at 1218. In another article, the purported purpose of a study was to examine "[t]he effects of occupational experience with microwave radiation (radar) on the health of U.S. enlisted Naval personnel ... in cohorts of approximately 20,000 men with maximum opportunity for exposure (electronic equipment repair) and 20,000 with minimum potential for exposure (equipment operation) who served during the Korean War period." R. at 1219. While the results in that instance were not statistically signifi-

cant overall, the Court finds the articles submitted by the appellant effectively demonstrate that the scientific theory at issue is not "inherently incredible."

■ Where scientific material such as this is submitted by the appellant and considered non-well-grounding by the Board, reference to FEDERAL RULE OF EVIDENCE (Fed.R.Evid.) 702, and the criteria found in *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 591–95, 113 S.Ct. 2786, 2796–97, 125 L.Ed.2d 469 (1993), would more thoroughly elucidate the necessary "reasons and bases" for the Board's decision. This Court has previously observed that many principles espoused in the FEDERAL RULES OF EVIDENCE have no place in veterans jurisprudence. *See Flynn v. Brown,* 6 Vet.App. 500, 503 (1994). In this case however, recourse to the Rules is appropriate where they will assist in the articulation of the Board's reasons.

In *Daubert,* the Supreme Court addressed the threshold admissibility requirements to be used by courts of the United States and federal magistrates in preliminary assessments of proffered scientific evidence. *See* Fed.R.Evid. 101; 28 U.S.C. § 451. In essence, the *Daubert* decision held that Fed. R.Evid. 702 "superseded" the *Frye* rule, but in effect, the decision incorporated the previously applied rule, which required "general acceptance" in the relevant scientific community before the theory at issue would be admissible in a federal court. *Daubert,* 509 U.S. at 597–99, 113 S.Ct. at 2799; *see also Frye v. United States,* 293 F. 1013 (1923). With regard to scientific evidence, the analysis set forth by the Supreme Court is useful in defining the "inherently incredible" exception to the presumption of credibility.

Fed.R.Evid. 702 states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Respecting this, the Supreme Court stated:

The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation.... [I]t would be unreasonable to conclude that the subject of scientific testimony must be "known" to a certainty; arguably, there are no certainties in science.... But, in order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—*i.e.,* "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.

*Daubert,* 509 U.S. at 590, 113 S.Ct. at 2795. Therefore, when federal trial judges are faced with expert scientific evidence, "[t]his entails a preliminary assessment of whether the reasoning or methodology underlying the testimony [or evidence] is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93, 113 S.Ct. at 2796. Such a preliminary assessment is not unlike the Board's threshold analysis of whether proffered evidence relating to a scientific theory is "inherently incredible," and therefore not entitled to the presumption of credibility, or not useful in a determination of a claim's well-groundedness. To aid the federal trial judges, the Supreme Court offered four general observations for use in preliminary determinations: Whether the theory can be (or has been) tested, whether the theory has been subjected to peer review and publication, whether the known or potential rate of error has been considered, and to what extent the theory is accepted in the relevant scientific community. *Id.* at 591–95, 113 S.Ct. at 2796–97. While this list is not exhaustive or conclusive, it can serve as a guideline for the BVA when making preliminary determinations. It should be remembered however, that at this phase of the adjudication, such evidence need only produce a possibility of substantiation, and in a merits adjudication, the evidence need only reach equipoise.

The theory that non-ionizing, microwave type radiation is emitted from naval radar

equipment and causes cancer appears, from the record, to have been tested and subjected to peer review. The appellant's articles were taken from apparently reputable publications, which, at a minimum, demonstrate that the theory is being considered and debated in the relevant scientific community. Taken together with Dr. Young's assertion that "radiation exposure . . . in conjunction with radar operation [is] highly likely" the cause of his four carcinomas (R. at 1268), appellant's evidence is certainly adequate to meet the threshold test of plausibility, and to pass muster even under the "inherently incredible" exception to the presumption of credibility.

The second exception to the presumption of credibility set forth in *King* is where "the fact asserted is beyond the competence of the person making the assertion." 5 Vet.App. at 21. In medical matters, competent medical evidence must come from a witness who is competent to testify as to the facts under consideration. *See Espiritu*, 2 Vet.App. at 494.

> Competency, however, must be distinguished from weight and credibility. The former is a legal concept determining whether testimony may be heard and considered by the trier of fact, while the latter is a factual determination going to the probative value of the evidence to be made after the evidence has been admitted.

*Layno v. Brown*, 6 Vet.App. 465, 469 (1994); *see also Cartright v. Derwinski*, 2 Vet.App. 24, 25 (1991) ("Although interest may affect the credibility of testimony, it does not affect competency to testify.").

Dr. Young has treated the appellant at least since 1989, and has practiced medicine for more than 15 years. R. at 41, 61, 1268. As his *curriculum vitae* is not present in the record, it is unclear what "special qualifications or expertise in the field of radiation exposure" the Board expected Dr. Young to present. He is board certified in internal medicine. Dr. Young's *qualifications* respecting radiation are to be considered only after an adjudication on the merits of appellant's claims is underway. The Board is not free to assess the weight proffered evidence will be accorded when determining whether a claim is well grounded. *Layno*, 6 Vet.App. at 469. On remand, should the Board determine that Dr. Young's qualifications respecting radiation raise significant questions as to the *credibility* of his testimony, sufficient "reasons and bases" for such a determination are required. 38 U.S.C. § 7104(d)(1).

The Board committed error in its determination that the claim was not well grounded, by rejecting Dr. Young's medical opinion and concluding that he "[did] not present any special qualifications or expertise in the field of radiation exposure," that "his opinion appears to be based upon nothing more than conversations with the appellant," and that it was of the "may or may not" variety of etiological conclusions. Indeed and to the contrary, Dr. Young's statement, at 70, reveals fifteen years' practice without encountering any other patient with the combination of carcinomas suffered by Mr. Rucker as a basis for the doctor's opinion as to causation. Since Dr. Young has *treated* the appellant at least since January 1989 (R. at 41, 61), the opinion is clearly based on more than conversations, and finally, "highly likely" is not "may or may not" terminology. *See Tirpak v. Derwinski*, 2 Vet.App. 609 (1992). If the Board consciously chose not to address the substance of a plausible medical conclusion, it surely would want to cite to competent evidence of record to support its implicit rejection of that conclusion. *Colvin v. Derwinski*, 1 Vet.App. 171, 175 (1991). The Board is always free to, and should, seek "an advisory opinion . . . or [quote] recognized medical treatises in its decision that support its ultimate conclusions." *Colvin*, 1 Vet.App. at 175; *Hatlestad v. Derwinski*, 3 Vet.App. 213 (1992).

## III. CONCLUSION

Accordingly, to the extent that the Board determined the appellant's claims for service connection for cancers of the bladder, left kidney, prostate, and right lung, as caused by ionizing radiation, were not well grounded, the decision is AFFIRMED. To the extent that the Board determined the appellant's claims for service connection for cancers of the bladder, left kidney, prostate, and right lung, as caused by non-ionizing radiation,

were not well grounded, the decision is RE-VERSED and the matter REMANDED for adjudication. On remand, the appellant will be free to submit additional evidence and argument, and the Board must seek any other evidence it thinks is necessary to the resolution of the appellant's claim. *Quarles v. Derwinski*, 3 Vet.App. 129, 141 (1992).

It is indeed quite careless and most unfortunate that the Board gave such superficial treatment to the textual material that was submitted, as well as to Dr. Young's statement. It would seem only appropriate that greater care be taken by Board members, particularly when dealing with elderly veterans, given the time involved in processing cases remanded by the Court.

STEINBERG, Judge, concurring in part and dissenting in part:

I concur in parts I. and II.A. of the opinion, in the result reached by the Court in part II.B. that the veteran's service-connection claim for non-ionizing-radiation-induced cancers is well grounded, and in the remand ordered in part III. However, for the reasons that follow, I do not believe that the majority articulates a solid basis for the well-groundedness conclusion or follows the correct path to reach it. Additionally, the part II.B. Federal Rules of Evidence (FRE) and *Daubert* case [1] discussions are inapposite to the process of BVA claims adjudication and the caselaw of this Court.

## I. Well–Grounded Claim

Section 5107(a) of title 38, U.S.Code, provides in pertinent part: "[A] person who submits a claim for benefits under a law administered by the Secretary shall have the burden of submitting evidence sufficient to justify a belief by a fair and impartial individual that the claim is well grounded." The Court has defined a well-grounded claim as follows: "[A] plausible claim, one which is meritorious on its own or capable of substantiation. Such a claim need not be conclusive

but only possible to satisfy the initial burden of [section 5107(a) ]." *Murphy v. Derwinski*, 1 Vet.App. 78, 81 (1990). A well-grounded service-connection claim generally requires medical evidence of a current disability; medical or, in certain circumstances, lay evidence of in-service incurrence or aggravation of a disease or injury; and medical evidence of a nexus between an in-service injury or disease and a current disability. *See Caluza v. Brown*, 7 Vet.App. 498, 506 (1995), *aff'd per curiam*, 78 F.3d 604 (Fed.Cir.1996) (table); *see also Heuer v. Brown*, 7 Vet.App. 379, 384 (1995) (citing *Grottveit v. Brown*, 5 Vet.App. 91, 93 (1993)); *Brammer v. Derwinski*, 3 Vet.App. 223, 225 (1992) (absent "proof of a present disability[,] there can be no valid claim"). A Board determination whether a claim is well grounded is a conclusion of law subject to de novo review by the Court under 38 U.S.C. § 7261(a)(1). *See Grivois v. Brown*, 6 Vet.App. 136, 139 (1994); *Grottveit, supra.*

In the case at hand, the majority strays from this well-established path when it explains: "Before today, the Court has not addressed the threshold question of what evidence will suffice to well ground a claim for service connection based on non-ionizing radiation exposure." *Ante* at 72. However, the caselaw cited above supplies a general, three-requirement standard by which the well groundedness of a claim is to be judged; generally, and barring any presumptions that may relax these standards (such as for ionizing-radiation exposure, for example [2]), to well ground a claim a veteran needs medical evidence of a current disability, medical or, in certain circumstances, lay evidence of in-service incurrence or aggravation, and medical evidence connecting the currently diagnosed condition to a condition arising or event occurring in service. Because there are no presumptions to apply in the case of exposure to *non*-ionizing radiation, I would make plain—as the majority's FRE and *Daubert* excursion has beclouded—that this veteran's

---

**1.** *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

**2.** *See* 38 U.S.C. § 1112(c); 38 C.F.R. § 3.309(d) (1996); *see also,* as to Vietnam veterans exposed

to certain herbicides in service, 38 U.S.C. § 1116(a)(1)(A), (2); 38 C.F.R. § 3.307(a)(6)(ii) (1996); as to certain former prisoners of war, 38 U.S.C. § 1112(b); 38 C.F.R. § 3.307(a)(5) (1996).

claim is subject to the same well-grounded-ness requirements as any other veteran's claim and that—again, absent any applicable presumptions—the height of the well-ground-edness hurdle goes neither up nor down based upon the asserted etiology of a veteran's condition.

In this case, Dr. Young's statements (R. at 1212, 1268), as cited by the majority, *ante* at 74, supply medical evidence of multiple carcinomas, thus satisfying the first of the well-groundedness requirements (current disability). Moreover, Dr. Young's testimony, again, as correctly cited by the majority, *ibid.*, links these carcinomas to the veteran's service ("I think it is quite reasonable to assume that the [radiation] exposure [the veteran] had in the Service is the cause of these multiple carcinomas.... I think [ ] it highly likely this is the cause." (R. at 1268)), thus satisfying the third of the well-ground-edness requirements (nexus), if there is plausible evidence that the veteran was exposed to radiation in service.

But I believe that the majority confuses the analysis by collapsing the second and third requirements when, based upon Dr. Young's statement, the veteran's documented service as a radar operator, and the treatises that the veteran submitted, the opinion presumes that Dr. Young's statement constitutes plausible evidence of exposure to nonionizing (microwave) radiation so as to satisfy the second well-groundedness requirement (in-service disease, injury, or event). In my view, it is necessary to evaluate Dr. Young's two statements more precisely and discretely. I find that Dr. Young's first statement fails to provide evidence of in-service exposure because it is based entirely upon history given by the veteran; Dr. Young writes: "He [the veteran] mentions that he did have some radiation exposure when he was in the Service many years ago and this would certainly be [a] rational explanation for the occurrence of four different types of carcinoma in one individual over a short period of time." R. at 1212. " 'Evidence which is simply information recorded by a medical examiner, unenhanced by any additional medical comment by that examiner,' does not satisfy [the] 'competent medical evidence' requirement set

forth in *Grottveit*, . [*supra* ]." *Dolan v. Brown,* 9 Vet.App. 358, 363 (1996) (citing *LeShore v. Brown,* 8 Vet.App. 406, 409 (1995)).

However, I believe that plausible evidence of exposure is present in the record on appeal in Dr. Young's second statement, where he wrote: "Mr. Rucker apparently did have a significant radiation exposure when he was in the Service many years ago; I believe in conjunction with radar operation." R. at 1268. This statement is more than the "bare transcription of a lay history" that the Court found insufficient in *LeShore, supra;* although it uses the word "apparently", this statement is reasonably read as a competent medical professional's articulation of his opinion that the veteran was exposed to non-ionizing radiation in service and (in conjunction with the rest of the statement, as quoted above) that that exposure caused the veteran's present carcinomas. Although this evidence is far from determinative, "the amount of evidence sufficient to make a claim well grounded differs from the amount sufficient for an award of service connection." *Meyer v. Brown,* 9 Vet.App. 425, 432 (1996). "[T]o be well grounded a claim need not be supported by evidence sufficient for the claim to be granted. Rather, the law establishes only a *preliminary* threshold of plausibility". *Robinette v. Brown,* 8 Vet.App. 69, 76 (1995); *see also Alemany v. Brown,* 9 Vet.App. 518, 519 (1996) (holding medical evidence as to nexus to service expressed as "possible" suffices for that aspect of a well-grounded-claim requirements); *Molloy v. Brown,* 9 Vet.App. 513, 516 (1996) (citing *Lathan v. Brown,* 7 Vet.App. 359, 366 (1995) (stressing that medical opinions need not "be expressed in terms of certainty in order to serve as the basis for a well-grounded claim")).

Thus, based upon the well-understood process set forth in our caselaw and identified above, I would find this claim to be well grounded, without regard to the articles on radar and microwave radiation, because Dr. Young's statements as to current diagnosis, exposure to non-ionizing radiation in service, and nexus to non-ionizing radiation exposure satisfy directly all three prongs of the *Caluza* test. As to one of the articles cited by the

majority, *Effects Upon Health of Occupational Exposure to Microwave Radiation (Radar)*, that article asserts that radar operators in the Korean conflict could be expected to have some minimal exposure to microwave radiation. R. at 1221 (comparing those veterans "minimally" exposed as radar operators to those "maximally" exposed as radar repairpersons). That medical treatise supplies no direct in-service incurrence evidence here because it is concerned only with the exposure of Korean-conflict veterans, whereas the veteran served only prior thereto. This treatise could, however, be viewed by the Board on remand as buttressing Dr. Young's opinion.

## II. Weight, Credibility, the Federal Rules of Evidence, and *Daubert*

Most of the majority opinion, including its departure from the simple process of analyzing well groundedness outlined above, appears to derive from the Board's error in concluding that Dr. Young did not present any "special qualifications". R. at 6. As the majority makes plain,[3] the Board is not free to judge weight or credibility at the well-groundedness stage, *ante* at 72, 74, except to the extent that it may determine certain evidence to be inherently incredible or beyond the competence of the witness. *See Justus v. Principi*, 3 Vet.App. 510, 513 (1992); *King v. Brown*, 5 Vet.App. 19, 21 (1993); *Layno v. Brown*, 6 Vet.App. 465, 469 (1994). Because the Board did not find Dr. Young's testimony incompetent or inherently incredible—but nevertheless apparently dismissed his testimony[4]—the BVA's error is clear, and the majority's FRE and *Daubert* analysis is unnecessary and extraneous.

Moreover, the majority opinion appears to add an entirely unnecessary adjudication hurdle when it concocts a new requirement to be applied where a medical report by a physician, who does not appear on the face of that report to be an expert in the particular field (here non-ionizing radiation), articulates a "proposed medical theory [with] scientific underpinnings". *Ante* at 72. In such situations the majority appears to require *evidence* that the scientific theory given by the licensed medical professional is not inherently incredible and then—not implausibly—relies upon the cited scientific articles as showing that the proposed connection between non-ionizing radiation and cancer is not "inherently incredible". *Ante* at 73. Instead, I would hold—and I believe our jurisprudence currently provides—that medical evidence is presumed credible, absent any indication that medical evidence is *inherently* incredible (that is, a statement that *on its face* is so far beyond the pale of reason that reasonable minds could not but agree that it is incredible) or beyond the competence of the witness (that is, testimony on a subject about which the witness has no personal knowledge or expertise whatsoever). Nothing more—or less—should be required as to medical evidence of nexus in order to well ground the claim. I see no basis for injecting the threshold complication added by the majority, that a claimant must point to evidence of a negative—lack of inherent incredibility—merely because a scientific theory is new and proffered by a physician rather than an "expert".

In extrapolating based upon *Daubert*, the majority misappropriates a decision that dealt exclusively with the screening function of trial judges in admitting or excluding expert testimony as outlined by FRE Rule 702. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 2794–95, 125 L.Ed.2d 469 (1993) ("under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable"). In the non-adversarial jurisprudence of veterans' claims, a test for screening out evidence has very little place. *See* 38 C.F.R. § 20.700(c)

---

3. The majority concludes: "In the instant case, the BVA committed error in assessing the credibility and weight of the evidence prior to determining whether the claim was well grounded"; "[t]he Board is not free to assess the weight proffered evidence will be accorded when determining whether a claim is well grounded", *ante* at 72, 74.

4. "Dr. Young does not present any special qualifications or expertise in the field of radiation exposure; moreover, his opinion appears to be based upon nothing more than conversations with the appellant—not upon a review of the relevant medical and military records." R. at 6.

(1996); *Robinette,* 8 Vet.App. at 75 ("[i]t is well established that the VA adjudication process is a nonadversarial one") (citing *Flynn v. Brown,* 6 Vet.App. 500 (1994)); *id.* at 75–77 (double hearsay evidence not excluded from VA claims adjudication process) (citing *Flynn,* 6 Vet.App. at 504); *Flynn, supra* (hearsay not excluded from VA claims adjudications by FRE); *Layno, supra* (distinguishing competency from weight and credibility, and noting that only competency involves a question of admissibility).

. Moreover, by invoking *Daubert* to suggest that the scientific underpinnings of a medical opinion are subject to analysis by the Board at the threshold stage of deciding whether a claim is well grounded, the majority appears to make an entirely new distinction between medical evidence and expert medical evidence, or, perhaps, between medical evidence based upon long-accepted scientific truths and medical evidence based upon novel scientific theories. *See Espiritu v. Derwinski,* 2 Vet.App. 492, 494–95 (1992) (distinguishing "lay" and "medical" testimony for purposes of supplying a medical opinion and suggesting that medical evidence is *itself* "expert" testimony as compared to that given by lay, nonmedically-trained witnesses). I can see no justification in our prior jurisprudence for distinguishing, *for well-groundedness purposes,* between the medical opinion of, for instance, a general practitioner and that of a nominal "expert" in a field: *At the well-groundedness stage,* one medical opinion of present disability, etiology, or nexus—presumed credible (that is, not, on its face, being inherently incredible)—is as good as any other. *See Goss v. Brown,* 9 Vet.App. 109, 114–15 (1996) (accepting a nurse's statement on equal terms with a doctor's for the purpose of satisfying the well-grounded claim requirement).

In my view, the *Daubert* criteria have no place at the well-groundedness stage where all evidence not, on its face, inherently incredible or beyond the competence of the witness should be presumed credible. In short, at this threshold stage, the Board generally ought not to weigh the evidence, consider the negative evidence, or perform any screening function whatsoever: the lodestar of a well-groundedness determination as to a service-connection claim has been and continues to be whether the veteran has presented a plausible claim based upon medical and other evidence presumed to be credible—a claim "capable of substantiation", *Murphy, supra,* in conjunction with VA's carrying out of its 38 U.S.C. § 5107(a) duty to assist. I would hold that a claimed medical etiology, no matter its divergence from the rank and file of VA claims as to such etiology, is not on its face inherently incredible so long as it is supported by medical evidence from a licensed health professional, as is this claim. *See Goss, supra.* Analysis of the underlying scientific validity of the medical opinion involved should be a matter purely for the merits-determination stage after a claim has been found to be well grounded.

### III. Evaluating Medical Evidence on Remand

The majority appears to be outlining in the last paragraph of part II.B. the ground rules for the BVA to follow in evaluating the medical evidence in the merits-adjudication stage on remand. Finding that Dr. Young's medical opinion is plausible as to a nexus between the veteran's carcinomas and his possible exposure to non-ionizing radiation while a radar operator during service, the Court then appears to be requiring that the Board cite to other competent medical evidence if it does not accept Dr. Young's medical opinion.[5] Although reliance on contrary medical evidence of record is one basis—perhaps the most frequent one—for discrediting a claimant's medical evidence, I do not believe it is the only way the Board can do so. Rather, I believe that the Board, as long as it presents a full statement of reasons or bases for doing so, should be able, at the merits stage, to discount medical evidence when it finds, for example, that the source has minimal expertise, has based his or her opinion on questionable science, has articulated an inade-

---

5. The majority opinion states: "If the Board consciously chose not to address the substance of a plausible medical conclusion, it surely would want to cite to competent evidence of record to support its implicit rejection of that conclusion." *Ante* at 74. I leave it to those better trained in mental gymnastics to parse the meaning of this sentence.

quate reasoning process (or no reasoning), or has used the wrong facts as the basis for his or her medical opinion. *See Hatlestad v. Derwinski,* 1 Vet.App. 164, 169, 170 (1991) (remanding for failure to provide an adequate statement of reasons or bases where "the decision [ ] includes neither an analysis of 'the credibility or probative value of the evidence submitted by or on behalf of the veteran in support of his claim ...' (*Gilbert,* 1 Vet.App. at 59)"; Board must make "express credibility determination regarding ... testimony"); *Justus, supra* (holding, in the case of new and material evidence, that "[i]n the adjudication that follows the reopening, the Board having accepted provisionally for reopening purposes the credibility of the new evidence, then must determine, as a question of fact, both the weight and credibility of the new evidence ...").

### IV. Miscellaneous

Finally, I am unable to join in the concluding paragraph of the opinion. I do not believe that differentials in the age of the veteran or the particular war/conflict or capacity in which he or she served either increase or decrease the Board's adjudicatory responsibility to be careful, thorough, and fair.

### V. Conclusion

For the above reasons, I am unable to join in all parts of the Court's opinion.