Citation Nr: 1749196 
Decision Date: 10/31/17 Archive Date: 11/06/17

DOCKET NO. 12-21 368 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Pittsburgh, Pennsylvania


THE ISSUES

1. Entitlement to service connection for vertigo, claimed as dizziness and Meniere's syndrome, to include as secondarily service-connected to an in-service injury. 

2. Entitlement to a total disability rating due to individual unemployability (TDIU), as a result of the Veteran's service-connected disabilities.


REPRESENTATION

The Veteran represented by: Susan Paczak, Attorney


WITNESS AT HEARING ON APPEAL

The Veteran


ATTORNEY FOR THE BOARD

P. Franke, Associate Counsel


INTRODUCTION

The Veteran served on active duty in the U. S. Navy from January 1977 to January 1981.

This matter initially came before the Board of Veterans' Appeals (Board) on appeal from a March 2011 rating decision by the Department of Veterans Affairs (VA) Regional Office (RO) in Pittsburgh, Pennsylvania.

The Veteran testified before the undersigned Veterans Law Judge (VLJ) during a September 2013 travel board hearing. A transcript of that hearing is of record.

In a July 2015 decision, the Board denied the Veteran's claim for entitlement to an initial compensable rating for his service-connected headaches and remanded the issues on the title page. This decision, as it pertained to headaches, was set aside and remanded by a September 2016 Court of Appeals for Veterans Claims (Court) memorandum decision. That matter was Remanded by Board decision of September 2017. The issues on the title page have since been returned to the Board. 

This appeal was processed using the Veterans Benefits Management System (VBMS) and the Legacy Content Manager Documents (LCMD) (formerly Virtual VA) electronic claims files. 

The issue of entitlement to a TDIU, as a result of the Veteran's service-connected disabilities, is addressed in the REMAND portion of the decision below and is REMANDED to the Agency of Original Jurisdiction (AOJ).



FINDING OF FACT

The Veteran's current disability characterized by vertigo did not have its onset in service, is not related to or permanently made worse by any disease, injury or event in service, including an in-service head injury.


CONCLUSION OF LAW

The criteria for service connection for vertigo are not met. 38 U.S.C.A. §§ 1131, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.303 (2017).


REASONS AND BASES FOR FINDING AND CONCLUSION

Duties to Notify and Assist

The Veterans Claims Assistance Act of 2000 (VCAA) provides that VA will notify the Veteran of the need of necessary information and evidence and assist him or her in obtaining evidence necessary to substantiate a claim, as well as obtaining a medical examination or opinion of the Veteran's disability when necessary. 38 U.S.C.A. § 5103 (a); 38 C.F.R. § 3.159 (b); Quartuccio v. Principi, 16 Vet. App. 183 (2002). VA has assisted the Veteran in obtaining evidence to the extent possible, in collecting service treatment records, arranging examinations and obtaining opinions. 

Service Connection 

Generally, service connection requires (1) the existence of a present disability, (2) in-service incurrence or aggravation of an injury or disease, and (3) a causal relationship between the present disability and the disease or injury incurred or aggravated during service. Davidson v. Shinseki, 581 F.3d 1313, 1315-16 (Fed. Cir. 2009); Shedden v. Principi, 381 F.3d 1163 (1995). Service connection may also be granted for any injury or disease diagnosed after discharge, when all the evidence, including that pertinent to service, establishes that the disease or injury was incurred in service. 38 C.F.R. §3.303 (d).

For chronic diseases listed at 38 C.F.R. § 3.309 (a), service connection may also be established by chronicity and continuity of symptomatology. 38 C.F.R. § 3.303 (b). Continuity of symptomatology may establish service connection if a claimant can demonstrate (1) that a condition was "noted" during service; (2) there is post-service evidence of the same symptomatology; and (3) there is medical or, in certain circumstances, lay evidence alone of a nexus between the present disability and the post-service symptomatology. Barr v. Nicholson, 21 Vet. App. 303, 307 (2007) (citing Savage v. Gober, 10 Vet. App. 488, 495-96 (1997)) ("[S]ymptoms, not treatment, are the essence of any evidence of continuity of symptomatology").

Lay Evidence 

Lay assertions may serve to support a claim for service connection by establishing the occurrence of observable events or the presence of disability or symptoms of disability subject to lay observation. 38 U.S.C.A. § 1154(a); 38 C.F.R. § 3.303(a); Jandreau v. Nicholson, 492 F.3d 1372 (Fed. Cir. 2007); see also Buchanan v. Nicholson, 451 F. 3d 1331, 1336 (Fed. Cir. 2006) (addressing lay evidence as potentially competent to support presence of disability even where not corroborated by contemporaneous medical evidence). Lay evidence can be competent and sufficient to establish a diagnosis or etiology when (1) a lay person is competent to identify a medical condition; (2) the lay person is reporting a contemporaneous medical diagnosis or (3) lay testimony describing symptoms at the time supports a later diagnosis by a medical professional. Davidson v. Shinseki, 581 F.3d 1313 (Fed. Cir. 2009).

The Veteran's Assertions

The Veteran contends that his vertigo disability is service-connected, as it is secondary in causation due to the head injury he sustained in service when he fell from a parked aircraft. He asserts that he has experienced dizziness since his discharge from the hospital when in service. He adds that he has not been as coordinated as he was prior to his accident. He further adds that he has experienced episodes of dizziness which have increased to the point that he can no longer work for fear of losing consciousness. 

Vertigo

The report attached to the Veteran's November 1978 in-service examination after his fall from the parked aircraft on which he was working noted occasional dizziness associated with his decreased right-sided hearing, although otherwise neurologically normal. The examiner restricted him from activities during which episodic bouts of dizziness would endanger him by falling and recommended that he be re-evaluated at the end of six months. 

May 1979 in-service treatment notes state that the Veteran had now completed his six-month limited duty period following his accident and his only problem is mild decreased hearing. Although the Veteran presented for various problems through September 1980, he presented with no complaints of balance issues.

A July 1979 Medical Board for the United States Navy noted the Veteran's primary diagnosis of basilar skull fracture, with right hemotympanum, resolved, and his secondary diagnosis as permanent sensorineural hearing loss, right ear, secondary to diagnosis no. 1. The Medical Board's report stated that the Veteran had gradually returned to essentially normal function and an asymptomatic status, except for decreased hearing on the right and associated tinnitus. The report further mentioned that the Veteran had been followed in the otolaryngology department, noting full healing of his tympanic membrane, but with severe right-side hearing loss. His general physical examination was normal and Medical Board's opinion was that the Veteran was fit for full duty, except for limitations regarding his hearing loss. 

In an April 1980 in-service consultation report, a coordination problem since the accident was reported. However, in the May 1980 report, although noting the Veteran complaints of diminished coordination, the examiner stated that there was "[n]o true vertigo. [Symptoms] slowly improving." He further noted that the series of cranial nerves were intact; eye function and other neurological tests indicated a normal examination; and he stated that symptoms were "probably post-concussive and are slowly resolving."

In an October 1980 in-service examination, the examination closest in time to the Veteran's separation from service, other than the Veteran moderate-to-severe right-side hearing deficit, the examiner checked "NORMAL" next to both "Ears" and "Neurologic (Equilibrium...)." 

November 1980 in-service otolaryngology records note that the Veteran currently does not have major balance problems. A hand-written note in the Veteran STRs states that the Veteran received a discharge physical examination in November 1980, but it was not put in the record.

In June 1981, the Veteran underwent a VA examination, in which the Veteran's reports of his in-service accident and its effects. However, the VA examiner diagnosed him with (1) history of basilar skull fracture; (2) deafness, tinnitus, sensorineural, right. No mention was made of any current balance problems. 

In March 2008 examinations, the Veteran denied dizziness, vertigo, seizures, altered gait, difficulty in coordination, tremors, or focal weakness. In undergoing general treatment at Pittsburgh VA in March and April 2010, the Veteran reported imbalance and difficulty walking straight, he reportedly experiences vertigo when he stands and he had a similar episode 25 years earlier, but it resolved without treatment. In a May 2010 VA audiological examination for hearing loss and tinnitus, the VA examiner noted vertigo "randomly and when standing up quickly." 

In June 2010, the Veteran presented for an otolaryngology consultation, in which his reports of head trauma were noted. The provider also noted that although told he had Meniere's disease, the Veteran had never had treatment for Meniere's disease. Additionally, the provider noted that the Veteran also suffered another episode of head trauma approximately four years prior, in which he suffered a fracture of his sphenoid bone involving vision loss in his left eye. Although the provider ordered a CT scan of the Veteran head for a follow-up examination, upon physical examination, a Dix-Hallpike test revealed no vertigo in the left or right head-hanging position. 

A June 2010 video electronystagmography (VNG) for testing his inner ear and central motor functions as a vestibular assessment revealed right unilateral weakness consistent with a peripheral vestibulopathy, but requiring clinical correlation. Further tests examining the Veteran's postural control indicated that the Veteran, although using his vision and somatosensory inputs for balance effectively, he did not use his vestibular system effectively; he did not select appropriate movement strategies for the amount of stability present; he did not execute properly effective balance control response; and he exhibited an inability to respond quickly and possess adequate range and strength to generate effective/timely responses to external influences. The audiologist recommended a follow-up examination with an ear, nose and throat examination. However, the June 2010 examination indicated normal results for vestibular testing except for balance, which the otolaryngologist suspected was due to the medication benzodiazepines and, to his surprise, he found no evidence of unilateral weakness or post-labryinthitis vestibulopathy despite the Veteran's history of prior severe head injury.

In an October 2010 VA examination for "neurological disorders, miscellaneous," the VA examiner noted the Veteran reports of vertigo, but also noted that he denied any motor or functional impairment. His diagnoses included vertigo - workup ongoing; no etiology has been determined; seems to be resolving.

In a January 2011 VA opinion, the VA examiner explained the above inconsistencies, first stating that the October 2010 examination had noted that "the Veteran does not have Meniere's, as this was the opinion of the [ear, nose and throat examination] service after testing. The Veteran does not have vertigo either; he complains of transient dizziness that only occurs during a headache. This was also clarified in the 10/6/2010 exam." The January 2011 VA examiner opined that the Veteran's "dizziness/headaches" were caused by and the direct result of falling out of a parked airplane in October 1978, while in service. The January 2011 VA examiner provided no further explanation or rationale.

VA progress notes from April 2013 contain the Veteran's first referrals for balance issues due to dizziness and headaches, for which he was diagnosed and which were noted as increasing. The provider administered several stability and motor control tests to determine if the Veteran possibly had vestibular hypofunction. In April 2013, the Veteran underwent stability and motor control tests, as well as range of motion and strength testing for hips, knees and ankles, at Pittsburgh VA. The results indicated static balance to be fair and balance when moving to be poor. The therapist devised a physical therapy plan for the Veteran.

In an August 2016 VA examination for ear conditions (including Vestibular and Infectious Conditions), the VA examiner noted the Veteran's reports that he had lived with lack of balance for 35 years , but also noted he denied having vertigo. In conducting the Dix Hallpike test (Nylen-Barany test) for vertigo, the August 2016 VA examiner found the results abnormal, with vertigo or nystagmus during test, stating that the Veteran exhibited vertigo sitting up from a lying position while performing this test; it resolved within one to two minutes with no evidence of nystagmus. She found that the Veteran had a vestibular condition. August 2011 and August 2012 MRI results, indicating normal results, were noted; gait and limb coordination and Romberg tests were normal; and the August 2016 VA examiner stated that the Veteran's ear or peripheral vestibular conditions did not impact his ability to work.

The August 2016 VA examiner opined that Veteran's current Meniere's syndrome with dizziness disability was less likely than not (less than 50 percent probability) incurred in or caused by the claimed in-service injury, event or Illness. She explained that the Veteran today on examination reports he was never officially diagnosed with Meniere's syndrome; he states he was seen for unrelated knee condition by orthopedic specialist in 2003 and was told he may have Meniere's disease by his gait and the way he walked, as well as hearing loss, vertigo and headaches. She stated that the Veteran reports he recently was evaluated by private ear, nose and throat specialist three weeks ago; he has no diagnosis of Meniere's at this time by this specialist, as the specialist needed to evaluate his medical records. 

The August 2016 VA examiner further explained that the in-service may 1979 treatment note stated that no further neurosurgery care is required and Medical Board dictated for return to full duty, limited by hearing deficit. She added that a and October 1980 examination (approximately three months before the Veteran separation from service) documents normal ear and ear drum examination findings and normal neurological examination findings, documents moderate to severe hearing deficit in right ear secondary to skull fracture that was documented in record and is silent for a chronic dizziness condition and is also silent for a Meniere's disease condition. The August 2016 VA examiner included a further summary of the record, as already set forth in this decision.

In March 2017, the August 2016 VA examiner provided a clarifying addendum opinion, which addressed new evidence and addressed whether any currently diagnosed condition involving symptoms of dizziness are at least as likely as not a residual of the in-service head injury. She opined that was less likely than not (less than 50 percent probability) incurred in or caused by the claimed in-service injury, event or illness. The August VA examiner explained that after a review of the record and the new evidence, particularly noting once again that the October 1980 in-service examination, approximately three months before the Veteran's discharge and described by her as a "separation" examination, documents normal ear and ear drum examination findings, normal neurological examination findings, documents moderate to severe hearing deficit in right ear secondary to skull fracture that was documented in record and is silent for any chronic dizziness condition, diagnosis or treatment.

The Veteran has submitted to the record a November 2016 private treatment examination by Dr. J. F. The physical examination revealed coordination to be normal in rapid alternating movements, finger to-nose and heel-knee-shin testing. Dix-Hallpike testing maneuvers were performed with infrared goggles in place and revealed no signs or symptoms of paroxysmal nystagmus or vertigo with either the right or the left ear down. Vestibular testing indicated abnormalities further indicating myogenic potentials consistent with decreased responses on the left and absent responses on the right and abnormal vestibular testing consistent with a right-reduced vestibular response. Dr. J. F. assessed the Veteran with right peripheral vestibulopathy, consistent with Meniere's disease on the right. He diagnosed the Veteran with disorder of vestibular function of both ears.

Arguments on the Veteran's behalf

The Veteran's representative argues, in her January 2017 correspondence, that the August 2016 VA examiner's apparent reason for saying the Veteran's vertigo was not service-connected is that he had not been diagnosed with Meniere's syndrome. Pointing out that Meniere's syndrome is not the only condition which can cause vertigo, the representative argues that the August 2016 VA examination is inadequate, as the August 2016 VA examiner did not discuss the issue of whether vertigo was the result of the in-service head injury and considers only that there is no diagnosis of Meniere's syndrome. 

However, in her examination, the August 2016 VA examiner under "Vestibular Conditions" answered "Yes" to the question "Does the Veteran have any of the following findings, signs or symptoms attributable to Meniere's syndrome (endolymphatic hydrops), a peripheral vestibular condition or another diagnosed condition from Section 1." She specified "Vertigo," stating the frequency as more than once weekly, with a duration of one to 24 hours. Therefore, the August 2016 VA examiner identified and considered vertigo, as related to Meniere's syndrome, in her opinion. Moreover, in this opinion and her March 2017 addendum opinion, which addressed causality due to the in-service injury, both rationales addressed her key point, as supported by the record, that in the October 1980 in-service examination, the examination closest in time to the Veteran's separation from service, other than the Veteran moderate-to-severe right-side hearing deficit, there were otherwise normal neurological examination findings and the record "is silent for any chronic dizziness condition, diagnosis or treatment." The rationales reasonably address the signs and symptoms associated with vertigo.

Additionally, the representative later submitted the September 2017 report of Dr. J. F., based on his November 2016 examination, set forth above. In his report, Dr. J. F. opines that it is more likely than not that the Veteran's dizziness and vertigo was caused by his in-service injury. He explained that the Veteran is suffering from "post-traumatic endolymphatic hydrops, a form of Meniere's disease, on the right," due to his in-service injury. The Board does not wish to belabor what is obvious, but this very diagnosis is consistent with the items under "Vestibular Conditions" in the August 2016 VA examination, to which the August 2016 VA examiner answered "Yes," discussed just above; that heading specifically included a reference to endolymphatic hydrops. Similar to the August 2016 VA examiner, Dr. J. F. identifies the Veteran's symptoms of "dizziness and vertigo;" then Dr. J. F. proceeds to diagnose him with this form of Meniere's disease. 

However, the Board notes that Dr. J. F.'s opinion on its own is not adequate. He states that, based on his November 2016 evaluation of the Veteran, he suffers from imbalance and dizziness, severe enough to cause instability. Although the Veteran had exhibited unsteady walking, Dr. J. F. noted that it is not based on a cerebellar abnormality. Dr. J. F. adds that the Veteran's unsteady gait "could be considered a form of vestibular ataxia and this could be considered a type of 'cerebellar gait.'" This is not sufficient. The Board cannot assert its judgment in medical matters; it does not have the expertise. Colvin v. Derwinski, 1 Vet. App. 171, 175 (1991). However, it is apparent to the Board that Dr. J. F. is stating that a cerebellar abnormality in the form of a gait is an essential element in his rationale. At first conclusory, the rationale in effect states that the Veteran's dizziness and vertigo symptoms are due to his in-service injury because he has dizziness and vertigo symptoms. Yet, further explanation is inconclusive because he does not have the associated cerebellar gait; however, Dr. J. F. continues and states that the Veteran's unsteady gait "could be" a form of vestibular ataxia and this "could be" considered a type of 'cerebellar gait.'" This suggests Dr. J. F. is not entirely convinced and speculating and, consequently, the Board must assign limited probative weight to this opinion, accordingly.

In the September 2013 private treatment opinion of Dr. J. D., in response to the question of whether the Veteran's dizziness/vertigo was caused by his in-service injury and would the residuals from the fall be considered service-connected problems, Dr. J. D. answers there is evidence of "some mild cerebellar findings," the presence of a cerebellar gait and this is "an indication to suggest why he is passing out." To the question of, if related to the in-service injury, what is the severity of the dizziness/vertigo, Dr. J. D. answers the blackouts could be a seizure disorder and under these circumstances, it would be a good idea to have an electroencephalogram done to make sure that the underlying cause is not missed, which could be related to his head injury. 

The Board cannot determine from the answer to the first question whether Dr. J. D. believes there is nexus between the Veteran current disability and his in-service injury, only that there is a possibility that at present he loses consciousness due to cerebellar findings. In regard to the second question, Dr. J. D. does not address directly the issue of severity, but, appears at this point to direct his answer to the question of a connection to service. Similar to Dr. J. F., he opines that the Veteran current disability "could be" a seizure disorder and any other cause found with additional testing "could be" related to his head injury. As with Dr. J. F.'s opinion, speculative musings as to what might be possible, in the absence of clinical findings, is of little use to the Board in making its determinations. This opinion is assigned limited probative weight as well.

Conclusion 

The Board has carefully considered the Veteran's testimony at his September 2013 Board hearing, as well as his reports during examinations, as they appear throughout the record. The Board has also reviewed the Veteran's statements from between July 2010 through July 2011 and his July 2013 and December 2013 statements, as well as the April 2013 statements of D. and L. M and J. S. and the July 2010 statements of R. B and J. O., all of which have assisted Board in understanding better the nature and extent of the Veteran's disability. As stated earlier in this decision, lay people are competent to report on symptoms and events they have observed or within their personal knowledge and they are credible in doing so. However, the Board must emphasize that he is not competent to diagnose or interpret accurately findings as to the origin or relation to service of his disability, as this requires highly specialized knowledge and training. See Jandreau v. Nicholson, 492 F.3d 1372, 1376-77 (Fed. Cir. 2007). 

Moreover, the Board must look to clinical findings when there are contradictory findings or statements inconsistent with the record. As stated above, the Board cannot render its own independent medical judgments and therefore, in the absence of an explicit indication in the contemporaneous evidence of service connection, it must rely on medical findings and opinions. Rucker v. Brown, 10 Vet. App. 67, 74 (1997). 

As discussed at great length above, after initial treatment for the 1979 in-service injury, the Veteran STRs do not reflect ongoing treatment and diagnoses for vertigo, dizziness or associated conditions. In particular the October 1980 examination, approximately three months before separation from service, makes no mention of this disability. By March 2010, the Veteran was consistently reporting related symptoms and test results indicated peripheral vestibulopathy. Although the January 2011 VA examiner opined that Veteran's disability is caused by his in-service injury, she provided no rationale whatsoever for this conclusion. The opinions of Drs. J. D. and J. F., for the reasons stated earlier in this decision, were conclusory, inconclusive, tentative, and without sufficient rationales, and therefore, inadequate. These opinions receive limited probative weight. 

As stated above, the August 2016 VA examiner stated that the Veteran had a vestibular condition; however, she could find in the record no indication of a direct connection to the Veteran's in-service injury. In her August 2016 opinion and her March 2017 addendum opinion, she made conclusions consistent with her findings and which were based on the record. Her opinions are accorded substantial probative weight.

The Board has considered the benefit-of-the-doubt doctrine; however, the Board does not perceive an approximate balance of positive and negative evidence. The preponderance of the evidence is against the claim, the doctrine is not applicable and the claim must be denied. 38 U.S.C.A. § 5107 (b); 38 C.F.R. § 4.3.




ORDER

Entitlement to service connection for vertigo, claimed as dizziness and Meniere's syndrome, is denied.


REMAND

The Veteran is service-connected for a right-shoulder disability, evaluated as 30 percent disabling; bilateral hearing loss at 10 percent; tinnitus at 10 percent; a neck disability at 10 percent; and headaches rated noncompensably disabling. The foregoing disability ratings give the Veteran a current combined disability rating of 50 percent. These schedular ratings would be insufficient to meet the regulatory threshold for TDIU eligibility. 

As noted above, the Board's September 2017 remand noted that since the September 2016 decision by the United States Court of Appeals for Veterans Claims (Court), setting aside the Board denial of an initial compensable rating for service-connected headaches, the Veteran has received additional treatment for headaches, has reported severe headaches virtually daily, has been prescribed some medication for the headache complaints, and has received treatment at a University Medical Center headache clinic and with a Dr. Ogren. The Board in its September 2017 remand directed that a new examination to be scheduled to determine the nature and extent of headaches and that the above treatment records be obtained. The record does not contain the results of a new VA examination and does not appear to contain treatment records from the headache clinic or from Dr. Ogren. 

Until the record reflects that the Board's prior directives are completed, particularly regarding the new VA examination, the evidence is insufficient to decide the TDIU claim.

The issues of entitlement to an initial compensable rating for headaches and entitlement to TDIU are inextricably intertwined. See Harris v. Derwinski, 1 Vet. App. 180, 183 (1991) (two issues are "inextricably intertwined" when they are so closely tied together that a final Board decision on one issue cannot be rendered until the other issue has been considered). Further consideration of this issue is deferred, pending the receipt of the results of new VA examination for headaches, the scheduling of which has already been directed by the Board's September 2017 remand, and the receipt of additional records, also specified in that remand. 

The TDIU claim is deferred and must be remanded to the AOJ to be joined in one appeal with the Veteran's claim for entitlement to headaches.

Accordingly, the case is REMANDED for the following action:

1. The claim of TDIU is deferred and is to be returned to the AOJ for associate with the already remanded claim of an increased rating for headaches. As that claim and the deferred claim for entitlement to a TDIU as a result of the Veteran's service-connected disabilities are inextricably intertwined, the AOJ should join them in one appeal. The AOJ should note that at present both claims share the same docket number.
 
2. After completing the above development and any other indicated development, readjudicate the claim with the headache claim. If the benefits sought are not granted, provide the Veteran and his representative with a supplemental statement of the case and allow an appropriate opportunity to respond before returning the case to the Board. 

The Veteran has the right to submit additional evidence and argument on the matter the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).


______________________________________________
MICHAEL D. LYON 
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs