http://www.va.gov/vetapp16/Files5/1639903.txt

Citation Nr: 1639903 
Decision Date: 09/30/16 Archive Date: 10/13/16

DOCKET NO. 09-23 247 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Muskogee, Oklahoma

THE ISSUES

1. Entitlement to service connection for type II diabetes mellitus, to include as due to herbicide (Agent Orange) exposure.

2. Entitlement to service connection for a cardiovascular disorder (to include hypertension) and a cerebrovascular disorder, to include as due to herbicide (Agent Orange) exposure.

3. Entitlement to service connection for a neurological or other disorder to the legs, feet, and hands, to include as due to herbicide (Agent Orange) exposure.

REPRESENTATION

Veteran represented by: Dale K. Graham, Agent

WITNESSES AT HEARING ON APPEAL

The Veteran and his spouse

ATTORNEY FOR THE BOARD

Paul S. Rubin, Counsel

INTRODUCTION

The Veteran had active duty service in the United States Army from September 1961 to September 1962. 

This matter comes before the Board of Veterans' Appeals (Board) on appeal from June 2008, September 2008, and November 2008 ratings decisions issued by the Department of Veterans Affairs (VA) Regional Office (RO) in Muskogee, Oklahoma.

This appeal was processed using Virtual VA and the Veterans Benefits Management System (VBMS). Accordingly, any future consideration of this Veteran's case should take into consideration the existence of this electronic record. 

In March 2011, the Veteran and his spouse presented testimony at a Travel Board hearing before the undersigned Veterans Law Judge. A transcript of that hearing is associated with the Veteran's VBMS claims folder. 

In August 2012, January 2014, and October 2015, the Board remanded the appeal for further development. The case has since been returned to the Board for appellate review. 

In a November 2015 statement, the Veteran requested a copy of his claims folder. In this regard, when a Privacy Act request is filed under § 1.577 of this chapter by an individual seeking records pertaining to him or her and the relevant records are in the custody of the Board, such request will be reviewed and processed prior to appellate action on that individual's appeal. 38 C.F.R. § 20.1200. The Board responded by providing the Veteran a copy of his claims folder on compact disc (CD) by way of a September 2016 letter. As such, the Board has complied with the Privacy Act request. 

This appeal has been advanced on the Board's docket pursuant to 38 C.F.R. § 20.900(c) (2015). 38 U.S.C.A. § 7107(a)(2) (West 2014).

In the present decision, the Board will adjudicate the issues of service connection for type II diabetes mellitus and service connection for a cardiovascular disorder/cerebrovascular disorder. However, the issue of service connection for a neurological or other disorder to the legs, feet, and hands is addressed in the REMAND portion of the decision below and is REMANDED to the Agency of Original Jurisdiction (AOJ).

FINDINGS OF FACT

1. The Veteran did not have service, or other duty or visitation, in the Republic of Vietnam or service along the Korean DMZ from 1968 to 1971. The evidence also does not show that he otherwise had exposure to Agent Orange or other herbicide agents at Fort Sill, Oklahoma during his active service from September 1961 to September 1962.

2. The Veteran's diabetes mellitus, cardiovascular disorder, and cerebrovascular disorder did not manifest in service or within one year thereafter and are not related to his active service, including his alleged herbicide exposure. 

CONCLUSIONS OF LAW

1. Type II diabetes mellitus was not incurred in active service, nor may it be presumed to have been so incurred. 38 U.S.C.A. §§ 1101, 1112, 1113, 1116, 1131, 1137, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.159, 3.303, 3.307, 3.309, 3.313 (2016).

2. A cardiovascular disorder (to include hypertension) and a cerebrovascular disorder were not incurred in active service, nor may they be presumed to have been so incurred. 38 U.S.C.A. §§ 1101, 1112, 1113, 1116, 1131, 1137, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.159, 3.303, 3.307, 3.309, 3.313 (2016).

REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

I. VA's Duty to Notify and Assist

The Veterans Claims Assistance Act of 2000 (VCAA), in part, describes VA's duties to notify and assist claimants in substantiating a claim for VA benefits. 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5106, 5107, 5126 (West 2014); Honoring America's Veterans and Caring for Camp Lejeune Families Act of 2012, Pub. L. No. 112-154, §§ 504, 505, 126 Stat. 1165, 1191-93; 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 3.326(a) (2016). 

For the service connection issues on appeal for type II diabetes mellitus and a cardiovascular disorder / cerebrovascular disorder, VA's duty to notify was satisfied by letters dated on April 2008, August 2008, August 2012, and December 2012. See 38 U.S.C.A. §§ 5102, 5103, 5103A (West 2014); 38 C.F.R. § 3.159 (2016); see also Scott v. McDonald, 789 F.3d 1375 (Fed. Cir. 2015). Several of these letters also discussed Agent Orange exposure. 

Accordingly, the Veteran has received all required notice in this case for the service connection issues on appeal for type II diabetes mellitus and a cardiovascular disorder/cerebrovascular disorder, such that there is no prejudicial error in the content or timing of VCAA notice. See also Shinseki v. Sanders, 556 U.S. 396 (2009) (an error in VCAA notice should not be presumed prejudicial and the burden of showing harmful error rests with the party raising the issue, to be determined on a case-by-case basis). In the present case, there has not been an allegation of any error in the VCAA notice provided to the Veteran. 

With respect to the duty to assist, the RO has secured the Veteran's service treatment records (STRs), service personnel records (SPRs), VA treatment records, private treatment records as identified by the Veteran, and VA examinations. For his part, the Veteran has submitted personal statements, argument from his representative, hearing testimony, and private medical evidence. 

The Veteran was also afforded a VA examination and opinion in June 2015 that addressed the etiology of his alleged current cardiovascular/cerebrovascular disorders. See McLendon v. Nicholson, 20 Vet. App. 79, 81 (2006); see also 38°U.S.C.A. § 5103A(d)(2); 38 C.F.R. § 3.159(c)(4). As will be discussed below, this VA examination and opinion was thorough, supported by explanations, based on a review of the claims folder, and supported by clinical evidence of record. The VA examination also considered the Veteran's lay assertions. As such, there is no basis for any further VA examination or opinion as to this particular issue on appeal. The June 2015 VA examination and opinion was adequate. 

The Board acknowledges that no medical examination has been conducted and that no medical opinion has been obtained with respect to the Veteran's service connection claim for type II diabetes mellitus. McLendon, 20 Vet. App. at 81; see also 38 U.S.C.A. § 5103A(d)(2); 38 C.F.R. § 3.159(c)(4). While the Board has considered the Veteran's lay assertions, the standards of McLendon are not met in this case. There is no allegation of treatment for or symptoms of type II diabetes mellitus during active service from 1961 to 1962. The Veteran's September 1962 STR discharge examination showed a normal endocrine system. There is also no probative evidence the Veteran was exposed to herbicides such as Agent Orange during service, as will be discussed in detail below. Thus, there is no in-service disease, injury, or event to which the Veteran's currently diagnosed Type II diabetes mellitus could be related. In essence, there is no probative or credible evidence of an in-service disease or injury for the type II diabetes mellitus issue, and no credible evidence of persistent/recurrent symptoms since service. Therefore, a VA examination and opinion is not warranted for the type II diabetes mellitus disorder at issue in the present case. 

The AOJ attempted to confirm the Veteran's alleged herbicide exposure on a factual basis, at Fort Sill, Oklahoma during service in 1962. However, the AOJ received negative responses for any herbicide exposure for the Veteran from the National Personnel Records Center (NPRC) in September 2008, from the Department of Defense (DOD) Inventory listing all herbicide use, storage, and testing sites in March 2015, and from the U.S. Army Joint Services and Research Center (JSRRC) in March 2015. A June 2015 Formal Finding Memorandum from the JSRRC coordinator detailed the AOJ's efforts to verify herbicide exposure for the Veteran, but the Veteran's alleged exposure to herbicides at Fort Sill, Oklahoma in 1962 could not be verified. (The specific findings of the NPRC and JSRRC are discussed in broader detail below).

VA's duty to assist includes obtaining records of VA medical treatment identified by the Veteran, regardless of their relevance. Sullivan v. McDonald, 815 F.3d 786, 793 (Fed. Cir. 2016). VA must continue to obtain such records unless it is documented that the records do not exist or that further efforts would be futile. 38°U.S.C.A. § 5103A(c)(2) (West 2014); 38 C.F.R. § 3.159(c)(2), (c)(3) (2015). See Bell v. Derwinski, 2 Vet. App. 611 (1992) (VA is charged with constructive knowledge of evidence generated by VA). In this case, attempts were made to secure additional VA treatment records identified by the Veteran dated in the 1960s from the Temple, Texas VA Medical Center (VAMC), but those searches yielded negative responses. Specifically, a negative response was received in October 2008. These records were potentially relevant to the Veteran's type II diabetes mellitus and cardiovascular disorders, according to the Veteran. It is clear in the present case that the RO has undertaken efforts to assist the Veteran in the development of these additional VA treatment records. Thus, the Board is satisfied that the RO has provided all assistance required by the VCAA. 38 U.S.C.A. §°5103A. The Veteran has been notified of the unavailability of these records.

With regard to the Veteran's Social Security Administration (SSA) records, VA can end its efforts to obtain medical records from a Federal agency, including the SSA, if the VA is informed that the requested records do not exist or further efforts would be futile. 38 C.F.R. § 3.159(c)(2). Here, the VA's request for the Veteran's SSA records was met with a negative response in November 2012, with an indication that the SSA was unable to locate any medical records for the Veteran. The VA also issued a Formal Finding of Unavailability for these SSA records in December 2012. Notice of the unavailability of the SSA records was provided to the Veteran by the VA in December 2012, in compliance with 38 C.F.R. § 5103A(b)(2) and 38°C.F.R. § 3.159(e)(1). There is no basis for any further pursuit of these SSA records, which are not available. 

With regard to the previous August 2012, January 2014, and October 2015 Board remands, the Board finds that the AOJ substantially complied with the Board's remand directives. Stegall v. West, 11 Vet. App. 268, 271 (1998). See also D'Aries v. Peake, 22 Vet. App. 97, 105 (2008) (holding that a remand by the Board confers on the claimant, as a matter of law, the right to substantial compliance with the remand orders, but not strict compliance). Specifically, pursuant to the remands, the AOJ attempted to secure private medical evidence and SSA disability records for the Veteran; secured additional VA treatment records; contacted JSRRC to attempt to verify any herbicide exposure for the Veteran; issued an additional SSOC, and afforded the Veteran a June 2015 VA examination to determine the etiology of any current cardiovascular / cerebrovascular disorder. As such, the AOJ has substantially complied with the Board's instructions. 

Moreover, for both service connection issues on appeal, neither the Veteran nor his representative has advanced any procedural arguments in relation to VA's duties to notify and assist. See Scott v. McDonald, 789 F.3d 1375 (Fed. Cir. 2015) (holding that "absent extraordinary circumstances . . . we think it is appropriate for the Board and the Veterans Court to address only those procedural arguments specifically raised by the veteran . . .").

The Board is therefore satisfied that the RO has provided all assistance required by the VCAA. 38 U.S.C.A. § 5103A (West 2014). Hence, there is no error or issue that precludes the Board from addressing the merits of the service connection issues on appeal for type II diabetes mellitus and a cardiovascular disorder/cerebrovascular disorder. 

II. Service Connection

Service connection may be granted for a disability resulting from disease or injury incurred in or aggravated by active military, naval, or air service. 38 U.S.C.A. §§°1110, 1131; 38 C.F.R. § 3.303(a). In addition, disorders diagnosed after discharge may also still be service-connected if all the evidence, including pertinent service records, establishes the disorder was incurred in service. 38 C.F.R. §°3.303(d). See Combee v. Brown, 34 F.3d 1039, 1043 (Fed. Cir. 1994). As a general matter, service connection requires competent evidence showing: (1) the existence of a present disability; (2) in-service incurrence or aggravation of a disease or injury; and (3) a causal relationship between the present disability and the disease or injury incurred or aggravated during service - the so-called "nexus" requirement. Holton v. Shinseki, 557 F.3d 1363, 1366 (Fed. Cir. 2009) (quoting Shedden v. Principi, 381 F.3d 1163, 1167 (Fed. Cir. 2004)). 

In the present case, diabetes mellitus and arteriosclerosis (coronary artery disease) and hypertension are listed as an enumerated "chronic disease" under 38 C.F.R. §°3.309(a); therefore, 38 C.F.R. § 3.303(b) applies. Walker v. Shinseki, 708 F.3d 1331, 1338-39 (Fed. Cir. 2013). Under 38 C.F.R. § 3.303(b), where the evidence shows an enumerated "chronic disease" in service (or within the presumptive period under § 3.307), or "continuity of symptoms" of such a disease after service, the disease shall be presumed to have been incurred in service. Walker, 708 F.3d 1335-1337.

Service connection for certain enumerated diseases, such as diabetes mellitus or arteriosclerosis or hypertension, may be also be established on a presumptive basis by showing that it manifested itself to a degree of 10 percent or more within one year from the date of separation from service. 38 U.S.C.A. §§ 1101, 1112, 1113, 1137; 38 C.F.R. §§ 3.307(a)(3), 3.309(a).

In addition, for chronic diseases listed in 38 C.F.R. § 3.309(a)-such as diabetes mellitus or arteriosclerosis or hypertension-service connection may also be established by showing continuity of symptoms, which requires a claimant to demonstrate (1) that a condition was "noted" during service; (2) evidence of post-service continuity of symptoms; and (3) medical or, in certain circumstances, lay evidence of a link between the present disability and the post-service symptoms. 38°C.F.R. § 3.303(b) (2015); see Walker, 708 F.3d at 1340 (Fed. Cir. 2013) (holding that only those chronic diseases listed in 38 C.F.R. § 3.309 are subject to service connection by continuity of symptoms described in § 3.303(b). The correct understanding of the "condition noted during service" is that the condition is one that is indicative of but not dispositive of a chronic disease. Walker, 708 F.3d at 1339. Stated another way, continuity of symptomatology after discharge is required only where the condition noted during service (or in the presumptive period) is not, in fact, shown to be chronic or where the diagnosis of chronicity may be legitimately questioned, i.e., "when the fact of chronicity in service is not adequately supported." 38 C.F.R. § 3.303(b). See also Walker, 708 F.3d at 1339-40. 

The law also provides that diseases associated with exposure to certain herbicide agents used in support of military operations in the Republic of Vietnam (Vietnam) during the Vietnam era will be considered to have been incurred in service. 38°U.S.C.A. § 1116(a)(1); 38 C.F.R. § 3.307(a)(6). The term "herbicide agent" means a chemical in an herbicide used in support of the United States and allied military operations in the Republic of Vietnam during the period beginning on January 9, 1962, and ending on May 7, 1975, specifically: 2,4-D; 2,4,5-T and its contaminant TCDD; cacodylic acid; and picloram. 38 U.S.C.A. § 1116 (a)(4); 38°C.F.R. § 3.307 (a)(6)(i). The presumption of service connection requires exposure to an herbicide agent and manifestation of the disease to a degree of 10 percent or more within the time period specified for each disease. 38 C.F.R. §°3.307(a)(6)(ii). 

The following disorders are associated with herbicide exposure for purposes of this presumption: AL amyloidosis, chloracne or other acneform disease consistent with chloracne, type II diabetes (also known as type II diabetes mellitus or adult-onset diabetes), Hodgkin's disease, ischemic heart disease, all chronic B-cell leukemias (including, but not limited to, hairy-cell leukemia and chronic lymphocytic leukemia) multiple myeloma, Non-Hodgkin's lymphoma, Parkinson's disease, early-onset peripheral neuropathy, porphyria cutanea tarda, prostate cancer, respiratory cancers (cancer of the lung, bronchus, larynx, or trachea), and soft-tissue sarcoma (other than osteosarcoma, chondrosarcoma, Kaposi's sarcoma, or mesothelioma). 38 U.S.C.A. § 1116(a)(2); 38 C.F.R. § 3.309(e).

To warrant service connection based on herbicide exposure, type II diabetes mellitus or ischemic heart disease (coronary artery disease) may manifest to a degree of at least 10 percent at any time after service. 38 C.F.R. § 3.307(a)(6)(ii).

VA is to give "due consideration" to "all pertinent medical and lay evidence" in evaluating a claim for disability benefits. 38 U.S.C.A. § 1154(a). The Federal Circuit has held that medical evidence is not always or categorically required in every instance to establish a medical diagnosis or the required nexus between the claimed disability and the Veteran's military service. Davidson v. Shinseki, 581 F.3d 1313, 1316 (Fed. Cir. 2009). 

That is, lay evidence can also be competent and sufficient evidence of a diagnosis or to establish etiology if (1) the layperson is competent to identify the medical condition, (2) the layperson is reporting a contemporaneous medical diagnosis, or (3) lay testimony describing symptoms at the time supports a later diagnosis by a medical professional. Davidson, 581 F.3d at 1316. See also Jandreau v. Nicholson, 492 F.3d 1372, 1376-77 (Fed. Cir. 2007). 

In short, when considering whether lay evidence is competent the Board must determine, on a case by case basis, whether the Veteran's particular disability is the type of disability for which lay evidence may be competent on the issues of diagnosis and medical causation. Kahana v. Shinseki, 24 Vet. App. 428, 438 (2011). "The question of whether a particular medical issue is beyond the competence of a layperson-including both claimants and [VA adjudicators] must be determined on a case-by-case basis. Id.

For instance, a layperson is competent to identify such disorders as varicose veins, tinnitus, and flat feet. 38 C.F.R. § 3.159(a)(2); Barr v. Nicholson, 21 Vet. App. 303, 310 (2007); Charles v. Principi, 16 Vet. App. 370, 374 (2002); Falzone v. Brown, 8°Vet. App. 398, 405 (1995). In contrast, a layperson is not competent to identify medical conditions that require scientific, technical, or other specialized knowledge, such as in identifying rheumatic fever. 38 C.F.R. § 3.159(a)(1); Woehlaert v. Nicholson, 21 Vet. App. 456, 462 (2007). 

Therefore, the Board must assess the competence and credibility of lay statements. Barr v. Nicholson, 21 Vet. App. 303, 308 (2007). 

The Federal Circuit has held that the Board can favor competent medical evidence over lay statements offered by the Veteran, as long as the Board neither deems lay evidence categorically incompetent nor improperly requires a medical opinion as the sole way to prove causation. King v. Shinseki, 700 F.3d 1339, 1344 (2012).

In determining whether service connection is warranted, the Board shall consider the benefit-of-the-doubt doctrine. 38 U.S.C.A. 5107(b); 38 C.F.R. § 3.102; Alemany v. Brown, 9 Vet. App. 518 (1996); Gilbert v. Derwinski, 1 Vet. App. 49 (1991).

 A. Type II Diabetes Mellitus

The Veteran contends that he was exposed to Agent Orange or other herbicide while on active duty at Fort Sill, Oklahoma in the early 1960s. He says that he was handling a drum or barrel of herbicide, when it spilled on top of him while moving it off a shelf during active duty. He believes these drums held Agent Orange or other herbicides, but he is not certain. At the time, he was told it was safe. He says he soaked his arms, face, upper body, and uniform. He had to wash his eyes out. He maintains he visited the military dispensary that evening where he was provided medicine to treat his chemical burns and blisters from the herbicide. As a result of the Agent Orange exposure, he says he developed type II diabetes mellitus and cardiovascular/cerebrovascular problems. As for his diabetes mellitus, he reports he was first observed to have high blood sugar a short time after service in 1963 or 1964, when he was treated at the VAMC in Temple, Texas. However, the VA doctors in 1963 or 1964 told him he did not have type II diabetes mellitus at that time. He adds that his type II diabetes mellitus was not officially diagnosed until many decades after service in 2007. See July 2008 informal claim; September 2008 and April 2014 Veteran's statements; June 2009 VA Form 9; March 2011 Travel Board hearing testimony at pages 2-8, 12, 22; May 2013 Report of General Information (VA Form 21-0820); March 2004 VA Agent Orange registry examination. 

Upon review of the evidence of record, the Board finds that service connection for type II diabetes mellitus is not warranted. 

The existence of a current disability is the cornerstone of a claim for VA disability compensation. 38 U.S.C.A. §§ 1110, 1131; see Degmetich v. Brown, 104 F. 3d 1328, 1332 (1997) (holding that interpretation of sections 1110 and 1131 of the statute as requiring the existence of a present disability for VA compensation purposes cannot be considered arbitrary). In the absence of proof of a current disability, there can be no valid claim. Boyer v. West, 210 F.3d 1351, 1353 (Fed. Cir. 2000); Brammer v. Derwinski, 3 Vet. App. 223, 225 (1992). In the present case, there is probative evidence that the Veteran meets the threshold criterion for service connection of a current disability. Boyer, 210 F.3d at 1353; Brammer, 3 Vet. App. at 225. Specifically, VA and private treatment records dated from 2007 to 2015 have diagnosed type II diabetes mellitus. Thus, the Veteran clearly has type II diabetes mellitus, and the remaining question is whether this disorder first manifested in service, manifested to a compensable degree within one year of service discharge, or is otherwise related thereto.

The presumption of service connection requires exposure to an herbicide agent and also manifestation of the disease to a degree of 10 percent or more within the time period specified for each disease. 38 C.F.R. § 3.307(a)(6)(ii). Type II diabetes mellitus is one of the diseases associated with herbicide exposure for purposes of the presumption. 38 U.S.C.A. § 1116(a)(2); 38 C.F.R. 3.309(e). To warrant service connection, type II diabetes mellitus may manifest to a degree of at least 10 percent at any time after service. 38 C.F.R. § 3.307(a)(6)(ii). VA and private treatment records dated from 2007 to 2015 confirm that type II diabetes mellitus was manifest to a degree of at least 10 percent or more after service for the Veteran. 38 C.F.R. §°3.307(a)(6)(ii). The Veteran therefore has type II diabetes mellitus, one of the disorders associated with herbicide exposure for purposes of this presumption. 38°U.S.C.A. § 1116(a)(2); 38 C.F.R. § 3.309(e).

However, with regard to presumptive service connection, the Veteran's SPRs, including his DD Form 214, show that he did not serve in the Republic of Vietnam during the Vietnam era, or in or near the Korean DMZ from 1968 to 1971. This fact is not in dispute. Therefore, he is not presumed to have been exposed to herbicides, including Agent Orange on the basis of any Vietnam or Korean DMZ service. 38 U.S.C.A. § 1116(a); 38 C.F.R. §§ 3.307(a)(6)(iii), (iv); 3.313(a). 

However, the presumption of service connection for herbicide-related diseases could apply if exposure to herbicides is shown on a factual basis. The VA Adjudication Procedure Manual provides a table detailing the steps the AOJ must take to verify herbicide exposure on a factual basis in locations other than Korea or Vietnam. See M21-1, Part IV, Subpart ii, Chapter 1, Section H, Topic 7, Block a (change date August 26, 2016). According to this provision, the AOJ follows the appropriate steps in this table, including asking the veteran the approximate dates, location, and nature of the alleged herbicide exposure. If a response from the veteran is forthcoming, the AOJ must send an e-mail inquiry to Compensation Service at the Agent Orange Mailbox (VAVBAWAS/CO/211/AGENTORANGE) to secure a copy of the DOD Inventory listing all herbicide use, storage, and testing sites. Finally, if the veteran and any SPRs that are secured provide sufficient information to permit a JSRRC search, the AOJ should send a request to the JSRRC for verification of exposure to herbicides. 

In essence, if the veteran did not serve in Vietnam during the Vietnam Era or the Korean DMZ in a particular unit during the required timeframe, actual exposure to herbicides must be verified through appropriate service department or other sources in order for the presumption of service connection for a herbicide-related diseased under 38 C.F.R. § 3.309(e) to be applicable. Exposure to herbicides is not presumed in such instances, but the exposure to one of the herbicides listed at 38°C.F.R. § 3.307(a)(6)(i) can still be established if shown by the facts of the case. Once exposure to herbicides has been established by the facts of the case, the presumption of service connection found in 38 C.F.R. § 3.309(e) for herbicide-related diseases is applicable. 

In this vein, the Board must determine, as a question of fact, both the weight and credibility of the evidence. Equal weight is not accorded to each piece of evidence contained in a record; every item does not have the same probative value. The Board must account for the evidence which it finds to be persuasive or unpersuasive, analyze the credibility and probative value of all material evidence submitted by and on behalf of a claimant, and provide the reasons for its rejection of any such evidence. See Struck v. Brown, 9 Vet. App. 145, 152 (1996); Caluza v. Brown, 7 Vet. App. 498, 506 (1995); Gabrielson v. Brown, 7 Vet. App. 36, 40 (1994); Abernathy v. Principi, 3 Vet. App. 461, 465 (1992); Simon v. Derwinski, 2 Vet. App. 621, 622 (1992); Hatlestad v. Derwinski, 1 Vet. App. 164, 169 (1991).

Upon review of the evidence, exposure to herbicides has not been established on a factual basis in this case. There is no probative, persuasive evidence of record demonstrating Agent Orange or other herbicide exposure for the Veteran. As noted above, the Veteran contends that he was exposed to Agent Orange or other herbicide while on active duty at Fort Sill, Oklahoma in the early 1960s. He says that he was handling a drum or barrel of herbicide, when it spilled on top of him while moving it off a shelf during active duty. He believes these drums held Agent Orange or other herbicides. At the time, he was told it was safe. He says he soaked his arms, face, upper body, and uniform. He had to wash his eyes out. He maintains he visited the military dispensary that evening where he was provided medicine to treat his chemical burns and blisters from the herbicide. 

In short, the Veteran offers no direct evidence that he was actually exposed to an "herbicide agent" as defined by 38 C.F.R. § 3.307 (a)(6)(i) - 2,4-D; 2,4,5-T and its contaminant TCDD; cacodylic acid; and picloram, or an equivalent variant of herbicide. See Compensation and Pension Bulletin, New Procedures for Claims Based on Herbicide Exposure in Thailand and Korea, 3 (May 2010); 2015 WL 65578 (Jan. 6, 2015); Parseeya-Picchione, No. 15-2124 (U.S. Vet. App. July 11, 2016)) (acknowledging that "herbicide agents" may include both tactical and commercial herbicides). For example, he has not asserted personal knowledge that the contents of the barrel he handled actually contained an herbicide - such as exemplified by labeling or marking of the barrel. Rather, he has testified to a liquid substance which caused chemical burns and blisters that, in and of itself, does not establish herbicide exposure.

In contrast, there is no probative or confirmatory evidence the Veteran was exposed to Agent Orange or other herbicide in such an instance at Fort Sill, Oklahoma. For example, the Veteran's SPRs did not document any herbicide exposure at Fort Sill. In addition, a September 2008 response from the NPRC indicated they had no record of exposure to herbicides for the Veteran. A March 2015 response from the JSRRC noted they coordinated their research with the National Archives and Records Administration (NARA) in College Park, Maryland. NARA was unable to locate any unit records for the Veteran for Fort Sill. Moreover, U.S. Army historical records did not document the spraying, testing; transporting, storage, or usage of Agent Orange/Tactical Herbicides at Fort Sill, Oklahoma. Furthermore, a review of the DOD listing of herbicide spray areas and test sites outside the Republic of Vietnam did not list Fort Sill, Oklahoma as a location. Additionally, there are no references to routine base maintenance activities such as range management, brush clearing, and weed killing, although these were accomplished at all military bases worldwide. The Board sees there is no evidence of record the Veteran was involved in base maintenance activities involving herbicide spraying on the perimeter of bases. Therefore, JSRRC was unable to document the Veteran's exposure to Agent Orange or other herbicides during service. 

A June 2015 Formal Finding Memorandum from the JSRRC coordinator detailed the AOJ's efforts to verify herbicide exposure for the Veteran, but the Veteran's alleged exposure to herbicides at Fort Sill, Oklahoma in 1962 could not be verified. The June 2015 Formal Finding Memorandum emphasized that the JSRRC and the Agent Orange box/Compensation and Pension (C&P) service can't verify the Veteran's allegation that he was exposed to herbicides at Fort Sill. There was no probative evidence of herbicide drums at Fort Sill. The Veteran reported at the hearing he was not even certain the drums in question held Agent Orange or other herbicides. The Veteran's assertions regarding herbicide exposure are outweighed by the other evidence of record. In particular, the DoD is the custodian of records for the historical use of herbicides, and is in the best position from review of its own records to determine whether an herbicide agent was present at Fort Sill. Overall, the Board finds that the DoD's determination that an herbicide agent was not present at Fort Sill - which is based on its own classified and unclassified documents - substantially outweighs the Veteran's assertions. 

In sum, there is simply no credible, reliable evidence of record of the Veteran's exposure to herbicides in service, nor any record demonstrating that herbicides were tested, stored, or transported at Fort Sill where the Veteran was stationed. As such, in light of the above evidence and the verification efforts, the probative, persuasive evidence of record demonstrates that herbicides were not present at Fort Sill during the Veteran's period of active service and, therefore, he was not exposed to an herbicide. Thus, he is therefore not entitled to service connection for on a presumptive basis for type II diabetes mellitus or ischemic heart disease as discussed in 38 C.F.R. § 3.309(e). 

This does not, however, preclude the Veteran from establishing entitlement to service connection for his type II diabetes mellitus with proof of actual direct causation. Combee, 34 F.3d at 1043. In fact, the Court has specifically held that the provisions set forth in Combee are applicable in cases involving any alleged Agent Orange exposure. Stefl v. Nicholson, 21 Vet. App. 120 (2007); McCartt v. West, 12 Vet. App. 164, 167 (1999). 

With regard to direct service connection, as to in-service evidence, the STRs are negative for any complaints, treatment, or diagnosis of type II diabetes mellitus or high blood sugar. In fact, at the September 1962 STR discharge examination and report of medical history, the Veteran was observed to have a normal endocrine system. Moreover, although STRs document various instances of in-service treatment for several disorders at Fort Sill, there is no record of the Veteran visiting the military dispensary for medicine to treat chemical burns and blisters from any alleged herbicide exposure. While cognizant that the absence of contemporaneous records is not an absolute bar to a veteran's ability to prove his claim, the Veteran's STRs do not suggest that he ever received chemical burns and blisters from any alleged herbicide exposure during service, as such an incident would ordinarily have been recorded in the STRs if had visited the dispensary as he alleges. See Buczynski v. Shinseki, 24 Vet. App. 221, 225-26 (2011). 

Post-service, there is no probative evidence of diabetes mellitus at a 10 percent level within one year after service. See 38 C.F.R. § 4.119, Diagnostic Code 7913 (a 10 percent rating is warranted for diabetes mellitus managed by restricted diet). Thus, the Veteran is not entitled to service connection for type II diabetes mellitus on a presumptive basis. 38 U.S.C.A. §§ 1101, 1112, 1113; 38 C.F.R. §§ 3.307(a)(3), 3.309(a); Walker, 708 F.3d 1335-37. 

Post-service, under 38 C.F.R. § 3.303(b), the probative evidence of record does not establish continuity of symptomatology for type II diabetes mellitus after discharge from active service in 1962, in lieu of a medical nexus. When the fact of chronicity in service is not adequately supported, then a showing of continuity after discharge is required to support a claim for disability compensation for the chronic disease. Proven continuity of symptomatology establishes the link, or nexus, between the current disease and serves as the evidentiary tool to confirm the existence of the chronic disease while in service or a presumptive period during which existence in service is presumed. 38 C.F.R. § 3.303(b). In this respect, the Veteran is indeed competent as a layperson to report purported symptoms and treatment for high blood sugar in 1963 and 1964 at the VAMC in Temple, Texas. See 38 C.F.R. §°3.159(a)(2); Barr, 21 Vet. App. at 307-09; Layno, 6 Vet. App. at 469. He competently adds that VA doctors told him at that time that he did not have diabetes mellitus. See March 2011 hearing testimony at page 22. He has not alleged being diagnosed with diabetes mellitus and being prescribed a restricted diet, which is required to establish diabetes mellitus to a compensable degree. 

However, once evidence is determined to be competent, the Board must determine whether the evidence also is also credible. The former, the Court has held, is a legal concept, which is useful in determining whether testimony may be heard and considered by the trier of fact, while the latter is a factual determination going to the probative value of the evidence to be made after the evidence has been admitted. Rucker v. Brown, 10 Vet. App. 67, 74 (1997) (emphasis added).

Definitions of credibility do not necessarily confine that concept to the narrow peg of truthfulness. Indiana Metal Prods. v. NLRB, 442 F.2d 46, 52 (7th Cir. 1971). Credibility has been termed as "the quality or power of inspiring belief." Webster's Third New International Dictionary (1966). "Credibility involves more than demeanor. It apprehends the over-all evaluation of testimony in the light of its rationality or internal consistency and the manner in which it hangs together with other evidence." Carbo v. United States, 314 F.2d 718, 749 (9th Cir. 1963).

That is, the Board must determine, as a question of fact, both the weight and credibility of the evidence. Equal weight is not accorded to each piece of evidence contained in a record; every item does not have the same probative value. The Board must analyze the credibility and probative value of all material evidence submitted by and on behalf of a claimant, account for the evidence that it finds to be persuasive or unpersuasive, and provide the reasons for its rejection of any material evidence favorable to the claimant. See Struck v. Brown, 9 Vet. App. 145, 152 (1996); Caluza v. Brown, 7 Vet. App. 498, 506 (1995); Gabrielson v. Brown, 7 Vet. App. 36, 40 (1994); Abernathy v. Principi, 3 Vet. App. 461, 465 (1992); Simon v. Derwinski, 2 Vet. App. 621, 622 (1992); Hatlestad v. Derwinski, 1 Vet. App. 164, 169 (1991). The Veteran's credibility affects the weight to be given to his or her testimony and lay statements, and it is the Board's responsibility to determine the appropriate weight. See Washington v. Nicholson, 19 Vet. App. 362, 368 (2005). 

The credibility of a witness can be impeached by a showing of interest, bias, inconsistent statements, the demeanor of the witness, the facial plausibility of the testimony, the internal consistency of the testimony, impairment in memory, or, to a certain extent, bad character, among other factors. Caluza v. Brown, 7 Vet. App. 498, 510-511 (1995), aff'd per curiam, 78 F.3d 604 (Fed. Cir. 1996). In particular, personal interest may affect the credibility of the evidence. Cartright v. Derwinski, 2 Vet. App. 24, 25 (1991). 

For continuity of symptomatology, the Board cannot determine that lay evidence lacks credibility solely because it is unaccompanied by contemporaneous medical evidence. Buchanan v. Nicholson, 451 F.3d 1331, 1336-37 (Fed. Cir. 2006). Symptoms, not treatment, are the essence of continuity of symptomatology. See Cartright v. Derwinski, 2 Vet. App. 24, 26 (1991). The Board may, however, weigh a lack of contemporaneous medical evidence as one factor, among others, that the Board can consider and weigh against lay evidence. Buchanan, 451 F.3d at 1337. That is, if it is determined based upon reliable evidence that there was an extended period of time after service without any manifestations of the claimed condition, then that tends to weigh against a finding of a connection between the disability and service. See Maxson v. Gober, 230 F.3d 1330, 1333 (Fed. Cir. 2000). 

In the present case, the Veteran's lay assertions as to continuity of symptoms for type II diabetes mellitus are inconsistent with the totality of the evidence of record, and entitled to less probative weight. 

That is, the post-service medical evidence is inconsistent with the Veteran's lay assertions regarding continuous high blood sugar a short time after service in 1963 and 1964 and thereafter. See Gardin v. Shinseki, 613 F.3d 1374, 1379 (Fed. Cir. 2010); Caluza v. Brown, 7 Vet. App. 498, 510-511 (1995) (the Board can use inconsistent statements, among other factors, to impeach the credibility of a witness). In this regard, contemporaneous evidence can have greater probative value than inconsistent testimony provided by the claimant at a later date. Curry v. Brown, 7 Vet. App. 59, 68 (1994). 

The Board must first establish a proper foundation for drawing inferences against a claimant from an absence of documentation. Fountain v. McDonald, 27 Vet. App. 258, 272 (2015). In this regard, the Veteran's statements in the following medical evidence, made for the purpose of medical diagnosis or treatment, are exceptionally trustworthy because the declarant has a strong motive to tell the truth in order to receive a proper diagnosis or treatment. White v. Illinois, 502 U.S. 346, 355-56 (1991); Rucker v. Brown, 10 Vet. App. 67, 73 (1997) (observing that, although formal rules of evidence do not apply before the Board, recourse to the Federal Rules of Evidence may be appropriate). In the present case, private and VA treatment records from multiple providers dated in the 1990s and early 2000s document a variety of reported symptoms and diagnoses, but fail to mention any complaints or treatment for diabetes mellitus or high blood sugar. A March 2004 VA Agent Orange registry examination failed to mention any diabetes mellitus or high blood sugar. More importantly, an April 2004 VA endocrinology outpatient note listed a family history of diabetes: for the Veteran's mother and grandmother, but only indicated he was on high cholesterol medication. The Veteran himself at that time stated that he was "not diabetic." Private Mary Mahoney Memorial Health Center records dated in June 2005, July 2005, February 2006, and November 2006 document hyperlipidemia, hypertension, peripheral vascular disease, and COPD, but with no mention of a history of high blood sugar or diabetes mellitus. 

It was not until a May 2007 VA primary care note that the Veteran indicated he wanted to check if he was diabetic because he had symptoms of hyperglycemia (high blood glucose or sugar). A possible diagnosis of diabetes mellitus was rendered. Finally, an October 2008 VA diabetology consult remarked the Veteran had a history of duration of diabetes for less than one year, but exact date is unknown. There was no mention of high blood sugar in the 1960s in any of these records. 

If the Veteran was having continuous high blood sugar or other diabetic symptoms ever since the early 1960s, common sense dictates it is highly unlikely he would fail to mention this in VA and private treatment records dated in the 1990s and early 2000s on these occasions above. Thus, the Veteran's recent lay statements reporting a continuous history of symptoms of the claimed disability are inconsistent with past records in which he appears to have reported other existing medical conditions without mentioning any problems related to his diabetes/high blood sugar. See AZ v. Shinseki, 731 F.3d 1303, 1315 (Fed. Cir. 2013) (recognizing the widely held view that the absence of an entry in a record may be considered evidence that the fact did not occur if it appears that the fact would have been recorded if present); Buczynski, 24 Vet. App. at 224 (when a medical condition or symptom has not been noted in the medical records, the Board may not consider that as negative evidence unless it is the sort of condition or symptom that would normally be noted or reported); Kahana v. Shinseki, 24 Vet. App. 428, 440 (2011) (Lance, J., concurring) (citing FED. R. EVID. 803(7) for the proposition that "the absence of an entry in a record may be evidence against the existence of a fact if such a fact would ordinarily be recorded"). The Veteran's failure to report any complaints of a diabetic condition at earlier instances of medical treatment is persuasive evidence that he was not then experiencing any relevant diabetic or high blood sugar problems, which outweighs his present recollection to the contrary.

With regard to a nexus, there is no probative medical evidence of record establishing a relationship between his current type II diabetes mellitus and his period of active service. Holton, 557 F.3d at 1366. See also 38 C.F.R. § 3.303(a), (d). Absent such evidence of a nexus, service connection is not in order for the Veteran's type II diabetes mellitus. 

With regard to lay evidence of a nexus between his current type II diabetes mellitus to service, lay persons are not categorically incompetent to speak on matters of medical diagnosis or etiology. Davidson v. Shinseki, 581 F.3d 1313, 1316 (Fed. Cir. 2009). In this vein, the Board must consider the type of condition specifically claimed and whether it is readily amenable to lay diagnosis or probative comment on etiology. See Woehlaert v. Nicholson, 21 Vet. App. 456, 462 (2007). 
The Veteran is indeed competent to report purported treatment for high blood sugar a short time after his service. See 38 C.F.R. § 3.159(a)(2); Barr, 21 Vet. App. at 307-09. However, this allegation is unsupported by subsequent VA and private medical evidence discussed above. Moreover, neither he nor his representative has medical training or expertise for offering a medical nexus opinion that his current type II diabetes mellitus, which requires laboratory testing to confirm, is related to any instances of high blood sugar a short time after service. See 38 C.F.R. §°3.159(a)(1)-(2); Jandreau, 492 F.3d at 1377. 

Regardless, the crux of the type II diabetes mellitus service connection issue on appeal centers on exposure to Agent Orange or other herbicides during service. However, as explained in detail above, the probative evidence of record does not establish Agent Orange exposure during his service at Fort Sill, Oklahoma in 1961 and 1962. 

Accordingly, the preponderance of the evidence is against the Veteran's service connection claim for type II diabetes mellitus. 38 U.S.C.A. § 5107; 38 C.F.R. § 3.102; Gilbert v. Derwinski, 1 Vet. App. 49 (1990). 

 B. Cardiovascular / Cerebrovascular Disorder

The Veteran also contends that as a result of the alleged Agent Orange or other herbicide exposure discussed above, he developed cardiovascular/cerebrovascular problems. In his initial May 2008 claim, he identified his cardiovascular disorder as arteriosclerosis (ischemic heart disease). Subsequently at the hearing he also mentioned having hypertension a short time after service in the 1960s. He has also mentioned having cerebrovascular problems due to a stroke suffered in 2003. Alternatively, he asserts the etiology of his current cardiovascular/cerebrovascular problems is related to a documented in-service head injury from a fall in April 1962. Specifically, he believes his current transient ischemic attacks (TIAs) and vertebrobasilar insufficiency result from a cerebral contusion in service. He raises this theory based upon oral information from his doctors and a reported search of internet articles. See July 2008 informal claim; November 2012 Veteran's statement; June 2009 VA Form 9; March 2011 Travel Board hearing testimony at pages 14-20; March 2004 VA Agent Orange registry examination. 

Upon review of the evidence of record, the Board finds that service connection for a cardiovascular disorder (to include hypertension) and a cerebrovascular disorder, is not warranted. 

In the present case, there is probative evidence that the Veteran meets the threshold criterion for service connection of a current disability. Boyer, 210 F.3d at 1353; Brammer, 3 Vet. App. at 225. Specifically, for a cardiovascular disorder, the Veteran has been currently diagnosed with carotid artery stenosis, hypertension, and congestive heart failure with the need for a pacemaker. See June 2005, July 2005, and February 2006 Mary Mahoney Memorial Health Center records; June 2011 VA cardiology procedure report; June 2012 private emergency room records; August 2014 VA primary care note. 

For a cerebrovascular disorder, the Veteran has been variously diagnosed with TIAs, vertebrobasilar insufficiency, bilateral cerebellar strokes (vertebrobasilar stenosis with small cerebellar infarction), peripheral vascular disease, and peripheral arterial disease. 

Thus, the Veteran clearly has current cardiovascular and cerebrovascular disorders, (to include hypertension), and the remaining question is whether any of these disorders first manifested in service or are otherwise related thereto.

With regard to presumptive service connection based on alleged herbicide exposure, the Board acknowledges that ischemic heart disease is a disease associated with herbicide exposure for purposes of the presumption. 38 C.F.R. § 3.309(e). However, as discussed above, the Veteran is not presumed to have been exposed to herbicides, and has not established actual exposure on a factual basis. Accordingly, the Veteran is not entitled to service connection for ischemic heart disease on a presumptive basis as discussed in 38 C.F.R. § 3.309(e). 

This does not, however, preclude the Veteran from establishing entitlement to service connection for his cardiovascular and cerebrovascular disorders with proof of actual direct causation. Combee, 34 F.3d at 1043. In fact, the Court has specifically held that the provisions set forth in Combee are applicable in cases involving any alleged Agent Orange exposure. Stefl v. Nicholson, 21 Vet. App. 120 (2007); McCartt v. West, 12 Vet. App. 164, 167 (1999). 

A November 1961 STR mentioned the Veteran's report of pain in the chest for several years, secondary to a football injury. There was no mention of a cardiovascular disorder. STRs also document that, in April 1962, the Veteran struck his head after falling down a flight of stairs. Imaging of the skull was deemed to be normal. A subsequent April 1962 STR noted that the Veteran did pass out and that his hands tingled before passing out. The Veteran was diagnosed with post-concussive headaches. A cerebral contusion was also diagnosed. However, a record prepared the following day in April 1962 indicates that there was no definite loss of consciousness associated with this fall. In any event, a DA Form 2173 contained in the STR packet found that this injury was incurred in the line of duty. 

The September 1962 STR discharge examination showed a normal heart and vascular system. There was no evidence of hypertension. For reference purposes, VA considers hypertension to be manifested by systolic predominantly 160 mm Hg or more, or diastolic pressure predominantly 90 mm Hg or more. See M21-1, III.iv.4.E.1.a. Pre-hypertension is defined as systolic pressure between 120mm and 139mm and diastolic pressure from 80mm to 89mm. M21-1, III.iv.4.E.1.a. M21-1, III.iv.4.E.1.d. A diagnosis of hypertension should be confirmed by blood pressure readings taken two or more times at least three different days. M21-1, III.iv.4.E.1.c. A chest X-ray was also negative. In his September 1962 STR discharge report of medical history, the Veteran did report pain and pressure in the chest, but he denied palpitations or a pounding heart. He also denied high blood pressure (hypertension). In the physician's summary, occasional pain in the chest was noted, but it was specified this pain was "not cardiac."

In any event, based on his documented in-service April 1962 head injury, the RO has already service-connected the Veteran for post-traumatic headaches. 

Post-service, there is no lay or medical evidence showing that the Veteran had ischemic heart disease or hypertension to a compensable degree within the first year after his separation from service in 1962/1963. Thus, the Veteran is not entitled to service connection for ischemic heart disease or hypertension, on a presumptive basis, either as a chronic disease during service or within one year of service. 38°U.S.C.A. §§ 1101, 1112, 1113, 1137; 38 C.F.R. §§ 3.307(a)(3), 3.309(a); Walker, 708 F.3d 1335-37.

Post-service, under 38 C.F.R. § 3.303(b), the probative evidence of record does not establish continuity of symptomatology for ischemic heart disease or hypertension after discharge from active service in 1962, in lieu of a medical nexus. In this respect, the Veteran is indeed competent as a layperson to report purported symptoms and treatment for high blood pressure or heart problems in the 1960s and 1970s. See 38 C.F.R. § 3.159(a)(2); Barr, 21 Vet. App. at 307-09; Layno, 6 Vet. App. at 469. Specifically, the Veteran says he was treated for hypertension in the 1960s, and in 1979 a private doctor wanted to provide a pacemaker for his cardiovascular problems. The VA received negative responses when it tried to secure any of these private or VA treatment records. The Veteran also testified these records could not be found. See March 2011 hearing testimony at pages 14-20. 

In any event, in the present case, any allegation of continuity of symptomatology or frequent and persistent symptoms for the Veteran's current cardiovascular and cerebrovascular disorders are not supported by the evidence of record. 

First, application of the continuity of symptoms regulation requires, at a minimum, a demonstration that a chronic condition was "noted" during service or during the presumptive period and evidence of post-service continuity of symptoms. See 38°C.F.R. § 3.303(b); Walker, 708 F.3d at 1336. The correct understanding of the "condition noted during service" is that the condition is one that is indicative of but not dispositive of a chronic disease. Id. at 1339. In the present case, as no ischemic heart disease or hypertension was "noted" in service or within one year of service for purposes of continuity of symptomatology, the theory of continuity of symptomatology does not suffice to establish that the veteran incurred a chronic disease in service. Id. 

Second, with regard to the Veteran's cerebrovascular disease due to a stroke, the post-service medical evidence is inconsistent with the Veteran's lay assertions regarding any symptoms of a cerebrovascular disorder from the time of his in-service head injury. See again Gardin, 613 F.3d at 1379; Caluza, 7 Vet. App. at 510-511 (the Board can use inconsistent statements, among other factors, to impeach the credibility of a witness). In this regard, contemporaneous evidence can have greater probative value than inconsistent testimony provided by the claimant at a later date. Curry, 7 Vet. App. at 68. Statements made for the purpose of medical diagnosis or treatment are exceptionally trustworthy because the declarant has a strong motive to tell the truth in order to receive a proper diagnosis or treatment. White, 502 U.S. at 355-56; Rucker, 10 Vet. App. at 73. 

In this regard, VA and private treatment records beginning in 2003 provide the first evidence of record for any cerebrovascular disorder. In 2003, the Veteran had repeated attacks of dizziness due to vertebrobasilar stenosis and small cerebellar strokes shown on MRI. As emphasized by the June 2015 VA examiner, the Veteran has a history of strokes confirmed by MRI and TIA's for which he is under treatment since 2003. He reported to the VA examiner that he did not have any problems with dizziness or spells between 1962 and 2003. He was able to drive a truck and able to work until 2007. He was told in 1979 that he had some plaque in his carotid artery. However he did not have symptoms of vertebrobasilar disease until 2003. His history at the time of admission in August of 2003 states that he had been having symptoms for 3 months prior. That leaves a 41-year gap between the head injury episodes in service and the more recent TIA episodes post-service in 2003. The Veteran was not started on Coumadin until 2003 according to an August 2003 VA neurology note. A prolonged period without medical complaint or symptoms can be considered, along with other factors concerning a claimant's health and medical treatment during and after military service, as evidence of whether an injury or a disease was incurred in service which resulted in any chronic or persistent disability. See Maxson, 230 F.3d at 1333.

Thus, the Veteran's STRs, (although confirming an in-service head injury), and the probative post-service medical and lay evidence of record, do not demonstrate chronicity in service or continuous symptoms or frequent and persistent symptoms thereafter for a cardiovascular or cerebrovascular disorder. 38 C.F.R. § 3.303(b). In summary, there is a lack of corroborating evidence as to the Veteran's lay assertions regarding continuity of symptoms or frequent or persistent symptoms for a cardiovascular or cerebrovascular disorder. 

With regard to a nexus, there is probative medical evidence of record that clearly weighs against a relationship between the Veteran's present cardiovascular and cerebrovascular disabilities and his period of military service. Holton, 557 F.3d at 1366. See also 38 C.F.R. § 3.303(a), (d). Specifically, a June 2015 VA examiner reviewed the claims file, including the STRs, post-service medical records, and lay assertions. The Veteran was diagnosed with vascular disease - thrombosis, TIA or cerebral infarction. He was diagnosed in 2003. The Veteran began treatment with an anticoagulant, warfarin, in 2003, which he continues up to the present time. He reports that he has had no more of these spells since. The VA examiner opined that a cardiovascular disorder to include carotid stenosis was less likely than not (less than 50% probability) incurred in or caused by the claimed in-service injury, event or illness. 

The July 2015 VA examiner reasoned that the Veteran's current symptoms are due to his diagnosis of cerebrovascular disease, not cardiovascular disease. He has a history of strokes confirmed by MRI and TIA's for which he is under treatment since 2003. He reports that he did not have any problems with dizziness or spells of this type between 1962 and 2003. He was able to drive a truck and able to work until 2007. He was told in 1979 that he had some plaque in his carotid artery. However he did not have symptoms of vertebrobasilar disease until 2003. His history at the time of admission in August of 2003 states that he had been having symptoms for only three months prior. That leaves a 41-year gap between the episodes in service in 1962 and the more recent episodes in 2003. Moreover, the VA examiner assessed that the description of the episodes in service is more consistent with vertigo caused by a peripheral vestibulopathy. The Veteran was only 18 years old at the time. The more recent episodes post-service are clearly consistent with his current vertebrobasilar disease.

The July 2015 VA examiner further added that there are two different etiologies for the events, and they are separated by over four decades of time. Thus, it is less likely than not that any currently manifested cardiovascular disorder to include carotid stenosis first manifested in service, manifested to a compensable degree within one year of service discharge or alternatively results from an event in service. 

The July 2015 VA examiner also commented that the Veteran's chest pain and cerebral contusion in April of 1962 during service are not of any significance in his case. The VA examiner reflected that, although trauma can cause damage to cerebral vessels, the effects would have been more immediately evident during service. The cause for the Veteran's current vascular disease is due to atherosclerosis of the arteries, not in-service trauma. The in-service chest pain is not significant because it is not a symptom of vertebrobasilar (cerebrovascular) disease. 

This July 2015 VA examination and opinion was thorough, supported by an explanation, based on a review of the claims folder, and supported by the evidence of record. 

In contrast, the Board sees the Veteran stated that he contacted the University of Oklahoma School of Medicine-Neurology Department. The Veteran described articles in two major text books with regard to injury of the basilar artery located in the back of the neck and scar tissue and other forms of injury to the artery. The Veteran remarked the in-service injury he sustained made it easy for plaque to build up because of the tissue surrounding the artery. The scar tissue is forced in the artery causing high spots. The plaque can create a build-up that will eventually close the blood flow to the base of the brain. The Veteran further added that all of the physicians he spoke to could not 100 percent guarantee that the in-service fall caused his post-service stroke. However, at the same time these physicians would not by the slightest odds disagree either. The Veteran believed his cerebrovascular problems seem to have been caused by the in-service fall in April 1962. He remarked that medical personnel at the University of Oklahoma found over twenty seven different articles on the basilar artery and that was only on the first computer search. Moreover, at the March 2011 hearing, the Veteran stated that doctors say that possibly his current stroke is related to his in-service head injury. See November 2012 Veteran's statement; March 2011 hearing testimony at pages 19-20. 

Where medical article or treatise evidence, standing alone, discusses generic relationships with a degree of certainty such that, under the facts of a specific case, there is at least plausible causality based upon objective facts rather than on an unsubstantiated lay medical opinion, a claimant may use such evidence to meet the requirement for a medical nexus. Wallin v. West, 11 Vet. App. 509 (1998). However, an attempt to establish a medical nexus between service and a disease or injury solely by generic information in a medical journal or treatise "is too general and inclusive." Sacks v. West, 11 Vet. App. 314, 317 (1998) (a medical article that contained a generic statement regarding a possible link between a service-incurred mouth blister and a present pemphigus vulgaris condition did not satisfy the nexus element). Still, medical treatise evidence can provide important support when combined with an opinion of a medical professional. Mattern v. West, 12 Vet. App. 222, 228 (1999). See Rucker v. Brown, 10 Vet. App. 67, 73-74 (1997) (holding that evidence from scientific journal combined with doctor's statements was "adequate to meet the threshold test of plausibility"). 

The Board has considered the medical literature discussed by the Veteran, but finds that it is of limited probative value. At the outset, he did not actually submit a written version of this evidence. Moreover, the subject of the articles appears to raise the possibility of a link between the in-service head injury and the current cerebrovascular disability. As such, the medical literature raises only a speculative possibility of such a link. The July 2015 VA medical opinion is more probative, because it was a product of consideration of the Veteran's relevant history and included a rationale specific to the Veteran. 

Also, the Board has considered the Veteran's contentions regarding physicians orally telling him the in-service fall could have caused his post-service stroke. In this regard, the Court has held that lay evidence regarding what a medical professional told a lay person was specifically listed as an example of competent lay testimony in Jandreau v. Nicholson, 492 F.3d 1372, 1377 (Fed. Cir. 2007). Therefore, the Veteran is competent to relate what physicians stated to him regarding a possible nexus. In other words, the Veteran is competent to relate what was told to him by physicians, and competent to relate what medial treatise evidence discussed, even though he has not submitted this evidence or provided adequate authorization to secure it. In any event, the private and VA medical records and VA opinion discussed above are more detailed and probative than the Veteran's lay statements, as they are based on a review of the claims file, including his statements, as well as on the clinicians' medical expertise. They are also supported by an adequate rationale. On the other hand, the Veteran's recitation of what doctors have told him and his interpretation of medical treatise evidence does not reveal the full basis or rationale for such opinions. There is no definitive or concrete medical opinion in support of the Veteran's assertions. Any evidence in support of the Veteran's contentions is outweighed by the written medical evidence of record. Overall, the preponderance of the competent, credible, and more probative evidence of record demonstrates that the Veteran's current cardiovascular and cerebrovascular disorders are not related to his documented April 1962 in-service head injury. 

With regard to lay evidence of a nexus, lay persons are not categorically incompetent to speak on matters of medical diagnosis or etiology. Davidson, 581 F.3d at 1316. In this vein, the Board must consider the type of condition specifically claimed and whether it is readily amenable to lay diagnosis or probative comment on etiology. See Woehlaert, 21 Vet. App. at 462. The Veteran is competent to report purported cardiovascular and cerebrovascular symptoms and treatment during and after service, although the Board has already found the post-service assertions of continuity are not particularly probative. See 38 C.F.R. §°3.159(a)(2); Barr, 21 Vet. App. at 307-09. Additionally, the Veteran is not competent to relate a current cardiovascular or cerebrovascular disability to service as such a relationship is not a condition readily observable by the senses, and is distinguishable from such conditions as tinnitus, varicose veins, and flat feet. See 38 C.F.R. § 3.159(a)(1)-(2); Jandreau, 492 F.3d at 1377. 

Furthermore, as discussed above, the Veteran's lay assertions in the present case are outweighed by the clinical findings of June 2015 VA examiner, who determined that the Veteran's current cardiovascular or cerebrovascular disorders did not originate during service. The Board can favor competent medical evidence over lay statements offered by the Veteran, as long as the Board neither deems lay evidence categorically incompetent nor improperly requires a medical opinion as the sole way to prove causation. King, 700 F.3d at 1344. In this case, the VA examiner reviewed and considered the evidence of record, including the Veteran's statements, and provided a medical opinion with a supporting rationale relying on medical training, knowledge, and expertise.

Accordingly, the preponderance of the evidence is against the Veteran's service connection claim for a cardiovascular disorder (to include hypertension) and a cerebrovascular disorder. 38 U.S.C.A. § 5107; 38 C.F.R. § 3.102; Gilbert v. Derwinski, 1 Vet. App. 49 (1990). 

ORDER

Service connection for type II diabetes mellitus, to include as due to herbicide (Agent Orange) exposure, is denied. 
 
Service connection for a cardiovascular disorder (to include hypertension) and a cerebrovascular disorder, to include as due to herbicide (Agent Orange) exposure, is denied. 

REMAND

Before addressing the merits of the Veteran's claim for service connection for a neurological or other disorder to the legs, feet, and hands, the Board finds that additional development of the evidence is required.

First, the Veteran should be scheduled for a VA neurological examination and opinion to determine whether he has a current neurological or other disorder to the legs, feet, and hands that is related to a documented in-service injury during military service. See McLendon v. Nicholson, 20 Vet. App. 79, 81 (2006); see also 38°U.S.C.A. § 5103A(d)(2); 38 C.F.R. § 3.159(c)(4). In this regard, STRs document some neurological symptoms in April 1962. Post-service, the Veteran states he continued to experience neuropathy to the extremities in the 1960s. Post-service, in the 2000s, the Veteran has been diagnosed with peripheral vascular disease, peripheral arterial disease, and diabetic peripheral neuropathy. 

Second, as the case is already being remanded, VA treatment records from the VA healthcare system in Oklahoma City, Oklahoma, dated from July 2015 to the present should also be associated with the claims file.

Accordingly, the case is REMANDED for the following action:

(Please note, this appeal has been advanced on the Board's docket pursuant to 38 C.F.R. § 20.900(c). Expedited handling is requested.)

1. The AOJ should secure complete VA treatment records from the VA healthcare system in Oklahoma City, Oklahoma, dated from July 2015 to the present, and associate them with the claims file. 

2. After any additional records are associated with the claims file, the AOJ should schedule the Veteran for a VA examination by an appropriate clinician to determine the etiology of any current neurological or other disorder to the legs, feet, and hands. Access to the claims file must be made available to the examiner for review. Any and all studies, tests, and evaluations deemed necessary by the examiner should be performed. The Veteran must be interviewed. The examiner must provide a clear rationale for the opinion, to include any comment on any credibility issues raised by the record from a medical perspective. 

The VA examiner must answer the following questions: 

A) Does the Veteran have a current neurological or other disorder to the legs, feet, or hands? In rendering this opinion, please comment on the relevance of the Veteran's currently diagnosed peripheral vascular disease, peripheral arterial disease, and diabetic peripheral neuropathy to his legs, feet, and hands. 

B) Is it at least as likely as not (i.e., 50 percent or more probable) that any current neurological or other disorder to the legs, feet, or hands began during service or is related to an incident of service, to include the Veteran's documented in-service April 1962 injury to the head and documented in-service treatment for numbness and tingling and weakness to the legs and hands. 

C) In rendering the above opinions, the VA examiner is advised of the following:

* The Veteran is already service-connected for post-traumatic headaches incurred as the result of the documented April 1962 in-service head injury. 

* The Veteran contends that he developed neuropathy to the legs, hands, and feet during service after the April 1962 head injury. 

* An STR clinical record and neurological examination dated in April 1962 revealed that the Veteran complained that his right leg goes to sleep as well as his right hand. There was numbness or tingling located on the medial aspect of the thigh and leg and over the right hand from the wrist down. However, the in-service neurological examination was normal throughout. 

According to another April 1962 STR, the Veteran's injury resulted from striking his head after falling down a flight of stairs. Imaging of the skull was deemed to be normal. A subsequent STR record notes that the Veteran did pass out and that he had a tingling of his hands before passing out. The Veteran was diagnosed with post-concussive headaches. 

An April 1962 STR health record from the same day notes that the Veteran had some weakness of hand grip bilaterally. 

Upon discharge in September 1962, the Veteran had normal neurological, upper extremities, lower extremities, and feet examinations. At his September 1962 STR discharge report of medical history, the Veteran denied neuritis or paralysis.

* Post-service, the Veteran describes symptoms of burning, aggravating and hurting pains to the legs, feet, and hands, necessitating post-service treatment in 1963, 1964, and 1965, with the Temple, Texas VAMC. (VA's attempts to secure any earlier VA treatment records from the 1960s were unsuccessful). However, the Veteran indicates these symptoms were less frequent back in the 1960s than they are at present. In other words, the symptoms have worsened over the years. He says these symptoms preceded any diagnosis of type II diabetes mellitus. The Veteran's wife also testified that a physician told her orally that the Veteran has peripheral neuropathy that could be the result of his in-service April 1962 fall. See September 2008 NOD; March 2011 hearing testimony at pages 22-24; October 2012 Veteran statement.

* Post-service, VA and private treatment records beginning in 2003 recorded diagnoses of vertebrobasilar stenosis, cerebellar strokes, peripheral vascular disease, and peripheral arterial disease. An August 2003 neurology note remarked that the Veteran was admitted for dizziness, slurred speech, and one attack of left sided weakness (left arm & leg). VA treatment records dated in 2004 mentioned decreased sensation in the feet, which the Veteran believed to be vascular. A March 2004 VA Agent Orange registry examination noted bilateral hand pain. A November 2006 Mary Mahoney Memorial Health Center record commented that when the Veteran was seen in June 2006, Coumadin was discontinued, at which point one week later, he experienced numbness, tingling, and weakness. The assessment was history of cerebrovascular accident. A July 2013 VA primary care note listed bilateral hand paresthesias with possible slight weakness (L>R), with diagnoses including peripheral neuropathy, carpal tunnel syndrome, and/or radicular symptoms +/- myelopathy from DJD/DDD of C-spine vs. other. An August 2014 VA primary care note assessed type II diabetes mellitus with peripheral neuropathy, not adequately controlled. His medication was increased and he was encouraged to routinely use his diabetic shoes and socks. 

* Post-service, a June 2015 VA examiner observed no muscle weakness in the upper or lower extremities; 5/5 strength on all upper and lower extremity strength testing; normal deep tendon reflexes; and no muscle atrophy. 

3. The AOJ should notify the Veteran that it is his responsibility to report for any scheduled VA examination and to cooperate in the development of the claim, and that the consequences for failure to report for a VA examination without good cause may include denial of the claim. 38 C.F.R. §§ 3.158, 3.655. 

4. After completing the above development, the AOJ should review the claims file and ensure that all of the foregoing development actions have been conducted and completed in full. See Stegall v. West, 11 Vet. App. 268, 271 (1998).

5. Thereafter, the AOJ should consider all of the evidence of record and readjudicate the issue of service connection for a neurological or other disorder to the legs, feet, and hands. If the benefit sought is not granted, issue a Supplemental Statement of the Case (SSOC) and allow the Veteran and his representative an opportunity to respond.

The Veteran has the right to submit additional evidence and argument on the matter the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).

______________________________________________
T. MAINELLI
Veterans Law Judge, Board of Veterans' Appeals

Department of Veterans Affairs